**THE CITY OF ROME. THE S-51. OCEAN S. S. CO. OF SAVANNAH v. UNITED STATES.**

District Court, S. D. New York. February 26, 1928.

1. **Collision** ⬬37—Vessel, when in doubt of proximity and navigation of another vessel, must slow or stop and reverse (33 USCA §§ 101, 104, 106, 108, 109).

It is duty of those in charge of the navigation of a vessel, when in doubt of the proximity and navigation of another vessel, to slow and stop or reverse their engines, in view of Act Aug. 19, 1890 (33 USCA §§ 101, 104, 106, 108, 109; Comp. St. §§ 7855, 7858, 7860, 7862, 7863), entitled "Regulations for Preventing Collision at Sea."

2. **Collision** ⬬37—Ship held at fault in collision for failure to blow whistle, alter course, or change speed after sighting white light on her starboard becoming brighter (33 USCA §§ 101, 104, 106, 108, 109).

Where persons navigating ship sighted white light on starboard side at distance of three to five miles, which steadily became brighter, and which did not change its bearing, ship was at fault in collision, under "Regulations for Preventing Collision at Sea" (Act Aug. 19, 1890; 33 USCA §§ 101, 104, 106, 108, 109; Comp. St. §§ 7855, 7858, 7860, 7862, 7863), in failing to blow whistle, change speed, or alter course of ship in time to avoid collision.

3. **Collision** ⬬75(1)—Rules relative to lights on vessels held applicable to submarines (Act Aug. 19, 1890 [amended May 28, 1894, and June 10, 1896] art. 2 [a], [c], [d]; 33 USCA § 72).

International Rules (Act Aug. 19, 1890 [amended May 28, 1894, and June 10, 1896] art. 2 (a), (c), (d), being 33 USCA § 72; Comp. St. § 7838), relative to masthead lights and red lights on port side of vessels, held to apply to submarines running on the surface.

4. **Collision** ⬬25—Owners of vessel, which failed to use required care to avoid colliding with submarine, held entitled to limitation of liability and half damages, where submarine lacked proper sailing lights (Act Aug. 19, 1890 [amended May 28, 1894, and June 10, 1896] art. 2 [a], [c], [d]; 33 USCA §§ 101, 104, 106, 108, 109; 46 USCA §§ 183-187; Public Vessels Act [46 USCA §§ 781-790]).

Owners of vessel, which collided with submarine due partly to vessel's fault in failing to stop or change course after sighting white masthead light on starboard side, under Regulations for Preventing Collision at Sea (Act Aug. 19, 1890; 33 USCA §§ 101, 104, 106, 108, 109; Comp. St. §§ 7855, 7858, 7860, 7862, 7863), met burden of proof to show that collision did not occur with their privity and knowledge, and were entitled to limitation of liability and half damages against United States owning submarine, under Rev. St. §§ 4283-4287 (46 USCA §§ 183-187; Comp. St. §§ 8021-8025), and Public Vessels Act (Act March 3, 1925 [46 USCA §§ 781-790; Comp. St. §§ 1251¾—1 to 1251¾—10]), where, submarine with which

vessel collided was not properly fitted with red lights on port side, as required by international rule (Act Cong. Aug. 19, 1890, as amended May 28, 1894, and June 10, 1896, art. 2, subds. [a], [c], [d]; 33 USCA § 72; Comp. St. § 7838); collision being primarily due to fault of submarine.

In Admiralty. Proceeding by the Ocean Steamship Company of Savannah, as owner of the steamship City of Rome, for exemption from and limitation of liability, and suit by said owner against the United States, as owner of the submarine S-51, for damages sustained as a result of a collision. Petition for limitation of liability granted, and decree for libelant against respondent for half damages; with reference on matter of damages.

Barry, Wainwright, Thacher & Symmers, James K. Symmers, and Earle Farwell, all of New York City, for Ocean S. S. Co. of Savannah.

Charles H. Tuttle, U. S. Atty., J. Frank Staley, Sp. Asst. Atty. Gen., Horace M. Gray, and Charles A. MacDonald, Sp. Asst. U. S. Attys., all of New York City.

Bigham, Englar & Jones, T. Catesby Jones, W. J. Nunnally, Jr., and James W. Ryan, all of New York City, for claimants Dobson and others.

Duncan & Mount, of New York City, and Arthur C. Muller, Jr., of Brooklyn, N. Y., for claimant Benoit.

William A. Ryan, of Brooklyn, for claimants Elser and others.

Silas B. Axtel, of New York City, and Elizabeth Robinson, for claimant Mims.

Kellogg & Rose, of New York City, for claimant Crawford.

J. Ralph Hilton, of New York City, for claimant Noble.

David C. Cohen, of New York City, for claimant McCarthy.

GODDARD, District Judge. Proceeding brought by the owner of the steamship City of Rome to limit its liability under sections 4283 to 4287 of the Revised Statutes (46 USCA §§ 183-187; Comp. St. §§ 8021-8025); and a suit by the owner of the City of Rome against the United States under the Public Vessels Act (Act March 3, 1925, 43 Stat. 1112, c. 428; 46 USCA §§ 781-790; Comp. St. §§ 1251¾—1 to 1251¾—10), for damages sustained by the City of Rome as a result of a collision between the City of Rome and the United States submarine S-51, in the Atlantic Ocean, off Block Island, on September 25, 1925, at 10:24 p. m.; the submarine having sunk almost immediately

after the contact, with the loss of the lives of 33 of her officers and crew.

The City of Rome was a passenger and freight steamer and was on one of her regular voyages from Savannah to Boston. She was 331 feet long, 46 feet beam, with a net tonnage of 2,300 and at the time of the collision, was drawing about 20 feet aft and 13½ feet forward. She had a full crew consisting of 78 members, including officers. She carried the regulation masthead, stern, and side lights, and her deck saloon, and cabins were brilliantly lighted.

The S–51, a submarine of the United States Navy, was 240 feet 6 inches long, 25 feet beam, with a surface displacement of upwards of 1,000 tons; she had a flush deck, with a conning tower, which was approximately 10 feet long and the forward end of which was located 116 feet from her stem. Her navigation lights consisted of a white light located on the forward end of the conning tower or chariot bridge 11 feet 2 inches above the hull, referred to as a masthead light; a white light on the after end of the conning tower, 10 feet 6 inches above the hull, 105 feet from the stern, and referred to as her stern light; a red light and a green light on the port and starboard sides respectively. A naval officer, who had made tests in behalf of the government, testified that the greatest distance the red light was visible was 1.6 miles and the white light 5.3 miles. Another witness testified that he had not been able to see similar colored side lights on a submarine until he was within 200 yards of it. Each side light was set in a recess of the chariot bridge 7½ feet above the hull; they were not fitted with inboard screens projecting 3 feet forward from the lights, but the sides of the recesses were relied upon for screens. The stern light was not screened, except by the conning tower shears. Her station was New London, and at the time she was engaged in an "availability run," commencing the 12-hour portion of her surface run at 6 p. m. on September 25th. The last communication from her was received by a sister ship, the S–50 at 8 o'clock that evening reporting her position at 8 o'clock as 5 miles north of Sandy Point Light on Block Island. Her movements between that time and the time of the collision are unknown.

The City of Rome passed Block Island, with the south light on Block Island approximately 3 miles abeam at 9:18 p. m., and where the collision occurred, as evidenced by the position of the submarine, which sank almost immediately after the contact, was 11.6 miles distant from that point, indicating that she, during this 1 hour and 6 minutes, had been traveling at an average speed of about 10.45 miles per hour, and the record indicates no change of speed from the time she had the light on Block Island abeam until she came in contact with the submarine. There was a breeze of 15 or 20 miles an hour from the northeast; the night was dark, but clear; sea choppy.

At 2 minutes after 10 o'clock, the bow lookout of the City of Rome, Adamson, sighted and reported to the watch officer in the pilot house, third officer, Dreyer, who also observed it, a white light bearing four points on the starboard bow; the lookout estimating the light as between 5 and 6 miles distant. The lookout continued to watch the light, which he says "stayed on the same bearings" and "came closer"—"the light was growing brighter." At 10:04 the master of the ship, Capt. Diehl, entered the pilot house and took charge of her navigation, and, seeing the white light, inquired from the third officer what it was, who replied that he thought it might be a light on "a tow going to the westward, or some small Coast Guard boat." The captain says he then walked to the port side of the ship to accustom his eyes to the darkness, and remained there, in some of his testimony 17 minutes, and in other testimony 3 or 4 minutes, when he returned to the starboard side and watched the light from time to time; that it remained on the same bearing; that for 20 minutes after he first entered the pilot house there was an uncertainty in his mind as to the character of the craft and as to the direction in which it was headed, but that during that time he blew no whistle; that about 15 minutes after his return to the starboard side he looked through the glasses, and it seemed to be "quite brighter, and I imagined I saw a reflection of the light on the water"; that the light was getting closer and brighter, and he ordered the helm to starboard, but did not blow two whistles, or give any warning of his change of course; that at this time the white light was 500 to 600 feet away; that, some 20 seconds after the starboard helm movement, a red light suddenly appeared on the other ship, a little to the right and lower than the white light; that when he saw the red light he swung hard aport, blew the danger signal, and signaled for full speed astern; that the submarine was struck on her port side, forward of her lights, and immediately she swung around on the starboard side of the City of Rome, parallel with her; that the collision occurred 30 to 35 seconds

after the red light appeared; that when the submarine came within the illumination of the deck lights of the City of Rome, some 60 or 70 feet, he saw that it was a submarine crossing his course at almost right angles.

The engine room log of the City of Rome shows that no signal for reverse or change of speed was received until 5 seconds after the collision. The testimony of the engineer in charge of the engine room is that no signal was received until after he had felt a sudden and violent jolt, which threw him against a bench near him, indicating that the ship had come in contact with another vessel.

The stem of the City of Rome penetrated the outer and inner hull of the submarine, only 3 members of her crew surviving; 6 officers and 27 enlisted men of the navy losing their lives, among them the claimants' decedents. The stem of the City of Rome came in contact with the S-51 at a point 31½ feet forward of the port side light. The testimony of the master and the third officer of the City of Rome, as indicated by oral statements and diagrams, is that the vessels came together at an angle variously estimated between 45 and 90 degrees. Two surveyors called by the petitioner testified that they examined the S-51 when she was in dry dock after the collision, and that the angle of collision was 72 degrees. There was some criticism that the measurements made by the surveyors were incorrect, as they had assumed that the submarine was lying parallel with the sides of the dry dock, when in fact her bow was to the left; but, if that were so, it would tend to make the angle of collision greater than the 72 degrees. Commander Ellsberg, who also examined the submarine, testified that the angle of collision was 40 degrees. When the submarine was examined by divers as she lay on the bottom after the collision, her heading was almost due north and rudder was "hard right."

Capt. Diehl has testified before the Naval Board of Inquiry and before the Board of Steamboat Inspectors, and such portions of his testimony as were offered in evidence at this trial have been taken into consideration, but not the testimony or record in the criminal proceeding.

During the present trial, Capt. Diehl was examined and cross-examined at length, and, after observing his manner of testifying and his general demeanor, my conclusion is, and I think this is supported by circumstances, that Capt. Diehl, the lookout, and the third officer at the wheel of the City of Rome saw the white masthead light, and but 30 to 35 seconds before the collision saw the red light to the right of this light, and that those on the City of Rome did not see the stern light until at or about the time the contact occurred; that when the white light was first seen it was upwards of 4 miles away and four points on their starboard bow, and that its bearing did not change, but the light grew brighter and came closer.

In order to determine what fault or combination of faults brought about the collision between the City of Rome and the S-51 it must first be ascertained what the situation was, and as the only survivors on the submarine were those who were below deck, and who neither saw nor knew what happened, their relative courses, and the situation as it then existed must be developed as nearly as possible from the facts and circumstances which now appear.

The conclusion which I reach, after considering everything in the case, is that they actually were on crossing courses when the City of Rome first sighted the submarine; that the City of Rome was headed for Vineyard Sound, approximately E. N. E., and that the submarine was headed in a northwest direction on a course which lay between Point Judith and Block Island. I reach this conclusion from the following facts, among others: That the master, third officer, and lookout of the City of Rome testified that they saw the masthead light, and later the port light, of the submarine, and never did see the stern light. This testimony is not contradicted by testimony or irreconcilable circumstances. It is obvious that on a crossing course the masthead light would be seen, and that on an overtaking course the masthead light would not have been seen, but the stern light would, and their testimony is that the red light, when it came into view, was to the right of this white light; that they did not see any other white light.

Further the submarine came within range of visibility at 10:02, and the testimony of Lieut. Hawkins is that the masthead light could be seen at a distance of 5.3 miles. While it is true that this distance may not be precisely correct, for it is based upon tests made with similar lights and on nights other than this one when the collision occurred; this night was a clear, dark one, and the conditions were not such as to reduce the distance in which a light could be seen. However, this distance coincides with the testimony of the lookout on the City of Rome, who says the light was 5 to 6 miles away when it first came into view, and that of the third officer, Dreyer, who also said that he sighted the light probably half a minute

after the lookout reported it, and that he approximated its distance away 3 to 4 miles, but that he was not certain of the distance. The facts indicate clearly that the vessels were not on parallel courses, and as they subsequently collided, without change of bearing until collision, that they were on converging courses.

With such information as is available, it is difficult and also unnecessary to determine the exact angle of convergence. However, the City of Rome and the S–51 were on converging or crossing courses, and the City of Rome was the burdened vessel under the starboard hand rule, provided the S–51 had, by the proper display of lights, indicated her position. Unless I disregard the testimony of all those navigating the City of Rome, and this I am not prepared to do, after seeing Capt. Diehl on the witness stand and listening to his examination and cross-examination by various counsel, I must accept it as true that only the mast headlight was seen by them until the City of Rome swung to port just before the collision. From the testimony it appears that those on board the City of Rome were "uncertain" as to what the character of the craft was which carried this white light and what her heading was.

Notwithstanding their uncertainty as to the heading of the vessel on their starboard side, they blew no whistle and did nothing for 20 minutes, and until they were so close that the danger had greatly increased. Two things they did know, however: One, that the light was steadily becoming brighter, indicating that they were getting closer, therefore approaching. Secondly, they had observed that the bearing of the light did not change. This could only mean that they were in converging courses, and risk of collision therefore was obvious. Thus a situation was presented which required action on the part of the City of Rome, as the burdened vessel, to prevent a collision, and which was bound to occur unless one of them altered her course, or changed her speed, or both.

The statute entitled "Regulations for Preventing Collision at Sea" (Act Cong. Aug. 19, 1890, c. 802, 26 Stat. 320 [33 USCA §§ 101, 104, 106, 108, 109; Comp. St. §§ 7855, 7858, 7860, 7862, 7863]) provides:

"Preliminary. * * * Risk of collision can, when circumstances permit, be ascertained by carefully watching the compass bearing of an approaching vessel. If the bearing does not appreciably change, such risk should be deemed to exist."

"Article 19. When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

"Article 21. Where, by any of these rules, one of two vessels is to keep out of the way the other shall keep her course and speed."

"Article 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse.

"Article 24. Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel."

[1] It is the duty of those in charge of the navigation of a vessel when in doubt of the proximity and navigation of another vessel, to slow or stop and reverse their engines. The Albert Dumois, 177 U. S. 240, 20 S. Ct. 595, 44 L. Ed. 751; The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126; The Munaires (C. C. A.) 1 F.(2d) 13; The Portia (C. C. A.) 64 F. 811. In Lie v. San Francisco & Portland S. S. Co., 243 U. S. 291, 37 S. Ct. 270, 61 L. Ed. 726, stating the rule that, unless a vessel convinces the court that her fault could not have contributed to the collision, she must be held at fault, Mr. Justice Clarke says, at page 298 (37 S. Ct. 272):

"Such a state of fact makes sharply applicable the conclusion of this court in The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148: 'But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.' "

At page 299 (37 S. Ct. 273): "The record before us not only fails to show that the fault of the Selja might not have been one of the causes of the accident, or that it probably was not, or that it could not have been one of the causes of it, but on the contrary, it clearly shows, as we have seen, that the negligent failure to observe the statutory rule contributed directly to cause the collision."

[2] The City of Rome made no change in course until she was close upon the S–51 and

it was too late, and then she failed to sound her whistle to inform the S-51 of the change. Not until after the ships had come in contact was the speed of the City of Rome reduced, according to those in her engine room, and which I find to be the fact. Had the City of Rome slowed down until her navigators were sure of the character and the light which was getting closer, and the course of the craft carrying it, and which they knew or should have known by the bearing of its light was converging on her course, it seems quite probable that the collision might have been avoided; therefore, she is to be held at fault.

The next question is whether the S-51 was at fault. The International Rules (Act Aug. 19, 1890, c. 802, 26 Stat. 320, as amended May 28, 1894, and June 10, 1896 [33 USCA § 72; Comp. St. § 7838]) provide (article 2):

"(a) On or in front of the foremast, or if a vessel without a foremast, then in the fore part of the vessel, at a height above the hull of not less than 20 feet, and if the breadth of the vessel exceeds 20 feet, then at a height above the hull not less than such breadth, so, however, that the light need not be carried at a greater height above the hull than 40 feet, a bright white light, so constructed as to show an unbroken light over an arc of the horizon of 20 points of the compass, so fixed as to throw the light 10 points on each side of the vessel, namely, from right ahead to two points abaft the beam * * * as to be visible at a distance of at least 5 miles. * * *

"(c) On the port side a red light so constructed as to show an unbroken light over an arc of the horizon of 10 points of the compass, so fixed as to throw the light from right ahead to two points abaft the beam on the port side and of such a character as to be visible at a distance of at least 2 miles.

"(d) The said green and red side lights shall be fitted with inboard screens projecting at least 3 feet forward from the light so as to prevent these lights from being seen across the bow."

The S-51 was 240 feet 6 inches long; her beam 25 feet; her surface displacement upwards of 1,000 tons; her forward white light was not 20 feet above the hull, but was only 11 feet 2 inches above the deck. The side lights were fixed in a recess on the chariot bridge 7½ feet above the hull; they were not fitted with inboard screens, projecting at least 3 feet forward from the lights. There is also testimony that the red light was so constructed and in such close proximity with the masthead light, only 3½ feet apart, that the visibility of the relatively dim red light was materially reduced by the greater brilliancy of the white masthead light.

Lieut. Hawkins, of the Bureau of Engineering Division, United States Navy, testified that the red light could not be distinguished from the white masthead light beyond 1.6 miles. Commander Saunders conceded that the interior method of screening was not satisfactory, and it further appears that after this disaster the government issued orders that certain submarines be fitted with temporary fore and aft screens "in lieu of the permanent side light fixtures which the Bureau of Engineering is working on for all classes of boats at the present time."

[3] Counsel for the government concedes that the navigation lights were not in accordance with article 2, and urges that such rules did not apply to submarines, at least in so far as the requirements respecting lights are concerned; one of his reasons being that, at the time the International Rules were adopted, submarines were not contemplated. But submarines had been in existence, although not in very general use, some 10 years when, on July 1, 1897, these rules went into effect. Moreover, the International Rules specifically provide in the enacting clause (33 USCA § 61; Comp. St. § 7834):

" * * * The following regulations for preventing collisions at sea shall be followed by all public and private vessels of the United States upon the high seas." And it has been held that even in time of war the International Rules respecting lights govern war vessels. Watts v. United States (D. C.) 123 F. 105.

I cannot accept the view that submarines running on the surface through traffic lanes are immune from the usual requirements regarding lights. I know of no good reason why they should be. The purpose of the regulations is to avoid loss of life and property. The strict observance by mariners of these or similar regulations have long been demanded by seafaring people. The character of the submarine and its method of operation are such that there seems to me to be more reason for further regulation of their operations than for relieving them from the rules applying to other vessels.

The obvious answer to the contention that the nature of their construction and operation makes it impractical for them to comply with these rules is that if this be so they should confine their operations to waters not being traversed by other ships. The

fact that they are more dangerous should not be a reason for their disregarding rules which other ships must observe. If there were no regulations, the ordinary rules of negligence and care due other ships would require that ships should, by lights or some method, inform each other of their courses and speeds. The testimony conclusively shows not only that the failure of the S–51 to show proper side lights might have contributed, but that it was a principal cause of the disaster.

[4] While the burden is upon the petitioner, claiming limitation of liability under sections 4283–4285 of the Revised Statutes (46 USCA §§ 183–185; Comp. St. 8021–8023), to show that collision did not occur with the privity and knowledge of the petitioner, it is evident that the burden has been fully met, and that the petitioner is entitled to limitation. The faults with which the City of Rome are charged are faults in navigation. Such faults are not chargeable to the executive officers of the corporation which owned the City of Rome. None of them were aboard her, and her navigation was intrusted to the master. She carried a full complement of licensed officers, able seamen, and crew, selected with due diligence. Those actually participating in her navigation at the time—the master, third officer, and lookout—were experienced men.

The objections raised to her right of limitation, which merit referring to, are that her searchlight was not in working order; that her pelorus was not mounted ready for use; that it did not appear that she had been properly inspected by the owner or her executive officers, and therefore "is privy to the conditions which a proper inspection would have disclosed." These objections are disposed of by referring to the record, from which it appears that no effort was made to use a searchlight until after the collision, so that, if it was not in working order, it had nothing to do with the collision. Moreover, a vessel is not required to carry a searchlight. A pelorus would not have given any additional information, for all agree that the white light on the S–51 maintained a constant bearing; furthermore, the method used by those navigating the City of Rome in ascertaining this bearing is shown to have been fairly accurate.

Conceding that the owner is privy to conditions which a proper inspection would have disclosed, and assuming that it does not appear that inspections were made, still no condition which contributed to the collision indicating lack of due diligence on the part of the owner, is disclosed. Immediately after the collision lighted preservers were put overboard, and a lifeboat was lowered by the City of Rome, and search was made for survivors, and all that could be found were picked up. The City of Rome herself circled around the spot until she had reason to believe that there were no further survivors, and at 11:45 p. m. resumed her voyage to Boston. While the master did not immediately send reports of the sinking to the navy officials, it is evident from after events that an earlier report of the sinking would not have enabled them to save those in the sunken submarine.

That the City of Rome should come into collision in the open sea with the S–51 was, in my judgment, primarily due to the lack of proper sailing lights on the S–51, and the failure of the City of Rome to use the required care to avoid her in the face of an obviously dangerous situation.

Accordingly, the petition of the Ocean Steamship Company of Savannah, as owner of the City of Rome, for limitation of liability, is granted, and the libelant, Ocean Steamship Company of Savannah, may have a decree against the United States for half damages, with the usual reference on the matter of damages.