## THE ABANGAREZ.

## UNITED STATES v. UNITED FRUIT CO.

### No. 18877.

District Court, E. D. Louisiana.
Aug. 3, 1932.

J. Frank Staley, Sp. Atty., Admiralty Division, Department of Justice, of Washington, D. C., and Edouard F. Henriques, Sp. Asst. in Admiralty to U. S. Atty., of New Orleans, La., for libelant.

Spencer, Gidiere, Phelps & Dunbar and Walker B. Spencer, all of New Orleans, La., for respondent.

BORAH, District Judge.

This case involves a collision that occurred in Colon Harbor on the morning of October 28, 1923, at 6:24 a. m. between the steamship Abangarez, owned by the United Fruit Company, and the submarine O-5, a war vessel owned by the United States.

The steamship Abangarez prior to and at the time of collision was in charge of a licensed Panama Canal pilot, and was proceeding from her place of anchorage in the harbor to the docks on a course practically due east. The submarine O-5, as the leader of a section of four submarines with a pilot in training on board, was immediately prior to the collision to the eastward of the center of the main channel proceeding on a course approximately south, destined for a transit of the Panama Canal to take part in fleet maneuvers in the Pacific Ocean. While thus proceeding on these headings at practically right angles to each other and at a point about 100 yards north and a little west of channel buoy No. 3, the Abangarez struck the submarine about 90 feet from her stern, causing her to sink, with the resultant loss of three members of her crew. The Abangarez was not damaged.

Following this collision various boards were convened with the purpose in view of fixing responsibility for the accident. On the afternoon of the same day the commanding naval officer constituted a naval board of investigation to investigate and report on the facts of the collision. On November 1, 1923, a local board of inspectors of the Canal Zone, consisting of naval officers of the United States, was organized to investigate the accident as required by law, and subsequently on the 23d day of November, 1923, a naval board of inquiry was convened to inquire into all the facts and circumstances concerning the accident.

At the trial respondent offered in evidence the testimony taken before the board

of local inspectors, and the exhibits filed in connection therewith of the commanding officers in charge of the submarines O-5, O-6, and O-8 and five other witnesses on board the submarines O-5 and O-6; the findings of fact and conclusions of the board of local inspectors and the exhibits attached thereto and a copy of the testimony of the commanding officer of the O-5 as given before the naval board of investigation. The government timely excepted to these offers, thus necessitating a ruling at this time as to their admissibility in evidence. I take it to be well settled that in admiralty pro hac vice the master is the owner, and any declarations or admissions made by him are admissible as evidence against the owner. The Potomac, 8 Wall. 590, 19 L. Ed. 511; The Rosalie M. (C. C. A.) 12 F.(2d) 970; The City of Rome (D. C.) 24 F.(2d) 729, 1928 A. M. C. 520. With reference to the other witnesses, the situation is different, and the testimony as offered is only admissible where the proper predicate is laid, and then only for the purpose of showing previous statements inconsistent with and discrediting their testimony in this case, and to that limited extent has their testimony been considered. As to the findings of the board of local inspectors, they are in the nature of public documents, and come within the exception to the hearsay rule; however, they are not binding upon the court, and, while admissible, have not been considered in a determination of the issues presented.

On August 12, 1927, the United States filed its libel in personam against the United Fruit Company and in rem against the Abangarez. At the trial proctor for the libelant abandoned its action in personam, conceding the fact that the owner could not be held liable for the negligence of a pilot taken under compulsion of law. Homer Ramsdell Co. v. Comp. Gen. Trans., 182 U. S. 406, 416, 21 S. Ct. 831, 45 L. Ed. 1155. The issue thus presents the sole question as to the liability of the Abangarez in rem for the negligence of a pilot which she was required to take in proceeding from anchorage to the dock.

The transit and harbor regulations of the Panama Canal and approaches thereto, including all waters under its jurisdiction, are based upon executive orders of the President made under authority conferred by the Panama Canal Act, 37 Stat. 562, 38 Stat. 385 (48 USCA §§ 1315, 1317). By executive order Rules of the Road, including signals, have been prescribed for the navigation of the Panama Canal and approaches thereto. With slight modifications and additions deemed necessary to adjust them to local conditions, these rules are the same as the Inland Rules. 30 Stat. 96 (33 USCA § 171 et seq.). The following are included in those rules:

"Rule 75. One short blast of the whistle signifies intention of or assent to steamer first giving the signal to direct course to her own starboard, except when two steamers are approaching each other at right angles or obliquely, when it signifies intention of steamer which is to starboard of the other to hold course and speed."

"Rule 79. If, when vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by making the danger signal, namely: Several short and rapid blasts, not less than four, on the steam whistle."

"Rule 80. Whenever the danger signal is given, the engines of both steamers shall be stopped and backed until the headway of the steamers has been fully checked; nor shall the engines of either steamer be again started ahead until the steamers can safely pass each other, and the proper signals for passing have been given, answered, and understood."

"Rule 104. When two steamers are approaching each other at right angles or obliquely so as to involve risk of collision, other than when one steamer is overtaking another, the steamer which has the other on her port side shall hold her course and speed; and the steamer which has the other on her starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steamer, or, if necessary to do so, slacken her speed, or stop, or reverse. The steamer having the other on her own port bow shall blow one blast of her whistle as a signal of her intention to cross the bow of the other, holding her course and speed, which signal shall be promptly answered by the other steamer by one short blast of her whistle as a signal of her intention to direct her course to starboard so as to cross the stern of the other steamer or otherwise keep clear.

"Rule 105. If, from any cause whatever, the conditions covered by this situation are such as to prevent immediate compliance with each others' signals, the misunderstanding or objection shall at once be made apparent by blowing the danger signal, and both steamers shall be stopped and backed, if necessary,

until signals for passing with safety are made and understood.

"Rule 106. Every vessel which is directed by these rules to keep out of the way of another vessel, shall, if the circumstances of the case permit, avoid crossing ahead of the other.

"Rule 107. Every vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed, or stop, or reverse."

"Rule 113. Nothing in these rules shall exonerate any vessel, or the owner or master, or crew thereof, from all the consequences of any neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

"Rule 114. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

The theory of the libelant's case rests upon the assertion that the Abangarez was at all times preceding and at the time of the collision a following and not a crossing vessel. This theory is supported by the officers and crews of the submarines, but is contradicted in every essential of fact, not only by the testimony of those on the Abangarez, but also by a host of disinterested witnesses, all of whom were in the employ of the government in and about Colon Harbor. The testimony thus may be considered to exhibit the conflict usual in collision cases; however, considering the testimony in the light of the physical facts, aided by the charts that have been offered in evidence, I have been able to arrive at a satisfactory conclusion.

In this case a number of the material facts are either admitted or not disputed. All witnesses agree that the Abangarez struck the submarine, bow on, and practically at right angles about 90 feet from her stern. They all agree that no signals were exchanged between the vessels, and that the only signal sounded was the danger signal blown by the Abangarez. There is also no serious dispute as to the fact that, when the Abangarez blew the danger signal, she immediately put her engines full speed astern and dropped her starboard anchor. The only material disagreement by any of the libelant's witnesses is to the time and place this was done. It is admitted by the witnesses for the libelant that, while the Abangarez was on her course towards the docks, the submarine's starboard engine was stopped when in close proximity to the Mole buoy and remained stopped for some minutes to take on a pilot. Whether or not the O–5 during this interval of time lost all of her way through the water presents a controverted issue. Libelant's witnesses also concede the fact that, when the pilot came alongside in a launch and boarded the O–5, an order was given "ahead both motors," and that a few minutes before the collision occurred the engines of the submarine were stopped. The evidence is all one way and to the effect that the O–5 made a futile effort to go ahead and change her course to the left, which maneuver could not be carried out either because of inattention in the engine room or because there was a lack of men to carry out orders promptly, and as a consequence the submarine drifted helplessly under way across the course of the Abangarez.

Such being the state of the record, there remain but three issues of fact that need be considered; namely, the anchorage ground of the Abangarez; her course up to the point of collision, and the maneuverings of the submarine O–5 and her locations at various times prior to the collision.

Capt. Card, master of the Abangarez, testified that on entering the breakwater entrance at 4 a. m. on the morning of the day in question he saw six vessels at anchor to the south of the west breakwater and west of the main channel; and that he proceeded with the Abangarez down the main channel until he had passed the most southerly anchored vessel; that upon reaching a point west of the Mole buoy he turned sharply to the west, left the main channel, and anchored at 4:25 a. m. about halfway between the Mole buoy and the buoy on the dumping ground.

The witnesses for the libelant place the Abangarez far north of the location designated by Capt. Card. In my judgment, it will serve no useful purpose to analyze the great mass of testimony that bears on this important factual issue; sufficient be it to say that I am persuaded that the mere estimates of the libelant's witnesses cannot prevail over the testimony of the ship, since that testimony has not in any way been discredited. And especially is that true where, as here, the master's testimony is corroborated by a number of disinterested witnesses whose familiarity with the locus in quo cannot be questioned.

Having determined the anchorage place of the Abangarez, it will be in order to consider her maneuverings from anchorage to the point of collision. Those in charge of her

navigation testified that while at anchor she was headed a little west of south; that at 6:10 a. m. the pilot came aboard and immediately ordered the anchor "hove up." At 6:14 the Abangarez was off the bottom and under way, with her helm hard astarboard and her engines full speed ahead, swinging down on a southerly course, and coming out of the swing she was steadied on a course practically due south. At 6:17 her engine speed was reduced to half speed, and the helm was ordered to starboard to give her head a swing to port, and she continued under a starboard helm movement until 6:20, when the stop order was given, at which time she was steadied on a course practically due east. At this time the pilot and captain of the Abangarez noticed that the submarine O-5 which had been lying practically dormant at a point somewhat south of the Mole buoy was then taking on a pilot. Two minutes thereafter, while the Abangarez was still on an easterly course headed across the channel just north and west of buoys 3 and 4, with her engines stopped, the submarine was observed coming forward with a burst of speed, apparently intending to cross her bow. When confronted with this situation, the pilot in charge of the Abangarez immediately realized that the distance between the indicated crossing point was too short to permit his vessel to hold her course and speed as the privileged vessel if the submarine maintained her course, and concluded that he could not with safety blow a crossing signal, but that a departure from the rule was justified under the then existing circumstances. Thereupon he sounded the danger signal, ordered the engines full speed astern, and the starboard anchor dropped, all of which was done simultaneously. However, in spite of these timely and precautionary measures, the Abangarez, under the momentum she had, went forward to the point of collision and at 6:24 struck the submarine a light blow about 90 feet from her stern, opening a deep cut in her side, which resulted in her sinking. The testimony of the pilot of the Abangarez with reference to her navigation and maneuverings from anchorage to the point of collision is not only borne out by the physical facts, but is corroborated by Capt. Card and Third Officer Oxholm, who was at the telegraph, as well as by Koelle, the pilot on the submarine O-5, and other disinterested eyewitnesses; furthermore, the probabilities all favor its acceptance.

There is no material dispute as to the course of the submarine O-5 up to the point of collision or as to her engine movements. The story of her commanding officer as given at the trial of this case, construed in its most favorable light, affords but little assistance to the libelant, and a fortiori is this true when his testimony and admissions before the various boards are considered; however, I take it that his testimony as given at the trial is probably more favorable to the libelant's case, and a recitation thereof will suffice to demonstrate its weakness, thereby obviating the necessity of particularizing as to its inconsistencies.

According to the testimony of the commanding officer, the submarine O-5, as the leader of a section of four submarines, left the docks at Coco Solo at about 5:50 a. m. and proceeded at a speed of 7½ or 8 knots on her starboard engine until arriving at a point in the main channel estimated at anywhere from 50 to 150 yards north of the Mole buoy where her engine was stopped for the purpose of taking on Koelle, the pilot. That he waited two or three minutes for the pilot to come aboard his ship, and when he did so he still had about 2 knots way on his vessel, and had drifted 50 or 100 yards past the Mole on a heading approximately south. That from his position on the bridge he conversed with the pilot, and while the latter still remained on deck he gave the order "ahead both engines." He estimates that it was one or two minutes after he gave this order, and at about the time that Koelle came up on the bridge, that he again noticed the Abangarez broad on his starboard beam and distant 400 yards. His first thought was that he was being crowded, and he commanded the quartermaster "keep to the left of the channel." That approximately thirty seconds thereafter the Abangarez drew slightly ahead, and seemed to start a swing towards him, and he then gave the order "stop both engines," assuming the Abangarez was making for the entrance to the canal, though he realized differently thirty seconds thereafter. According to his version, which is disputed by Koelle, the swing of the Abangarez then became swifter and faster, and he turned to Koelle and said, "I think I will back," to which the latter replied, "No, I think your only chance is to go ahead," and he thereupon gave the order "ahead both," at which time he was approximately 200 yards from the point of collision. He admits that this order was not complied with because both of the engine clutches had not been disengaged in accordance with absolute submarine doctrine, and in consequence his vessel, incapable of maneuvering on her engines or motors, drifted for three minutes helplessly across the bow of the Abangarez, and at the time of

collision was making a speed of approximately 2 knots.

■ Considering the testimony of the commanding officer of the submarine in the light of all the other facts and circumstances surrounding the case it is obvious that the O-5 was grossly at fault for running on her engines through a crowded and congested harbor when she was not in a proper maneuvering condition, because the fact is uncontroverted that her engines were incapable of any astern movement and reverse action could only be had on her motors. This being true, it follows that, had the O-5 been operating on her motors, she would not have remained out of command for a period of three minutes. Another culpable fault contributing to the collision was the fact that the submarine did not maintain a proper and vigilant lookout, and her conduct in starting forward at full speed on both engines without first making proper observation of the position and movements of other vessels in the harbor is inexcusable. She was also at fault for recklessly proceeding ahead on her engines when doubtful of the course and intentions of the Abangarez and in pursuing a course in such dangerous proximity thereto while unable to reverse. The O-5 misjudged the then existing situation and as the burdened vessel violated the crossing rule and took no proper or effective steps which were easily available to avoid the collision. The testimony shows that her anchor could have been dropped in thirty seconds, and, if her speed was no greater than as testified to by her commanding officer, this precautionary measure timely executed would undoubtedly have completely checked her headway. However, she was permitted to remain out of command and helplessly to drift across the bow of the Abangarez, whereas, had she been under control and operating on her motors, there can be slight doubt but she could have completely stopped, or, proceeding forward, could have passed safely ahead of the Abangarez.

■■ The situation was originally one of crossing, and the Abangarez as the privileged vessel was obligated to timely inform the submarine of her intention to hold her course and speed; however, her failure to do so not only did not, but could not, have contributed to the collision, and her course of conduct was justified because a new situation had arisen when the submarine came ahead on her engines with wide open throttles, and it became apparent that it was impossible for the vessels to comply with the rule relative to a crossing situation. Because of this changed condition, the situation was altered to one of special circumstance, and it became the duty of the Abangarez and the submarine as well to take all precautions necessary to avoid the collision. This the Abangarez did by blowing the danger signal, reversing her engines and dropping anchor, while the submarine O-5 without engine or helm movements remained helplessly for three minutes out of command. Where, as here, the fault of one vessel is so obvious and inexcusable, the evidence to establish fault on the part of the other vessel must be clear and convincing to make out a case for apportionment of damage. The City of New York, 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84; The Oregon, 158 U. S. 186, 15 S. Ct. 804, 39 L. Ed. 943. In my judgment, this collision was occasioned wholly by the fault of the submarine O-5 and a decree may accordingly be entered dismissing the libel.