**FEGAN v. LYKES BROS. S. S. CO., Inc.**
**No. 17353.**

Court of Appeal of Louisiana. Orleans.
April 22, 1940.

Rehearing Denied June 4, 1940.
Writ of Certiorari Granted July 18, 1940.

Terriberry, Young, Rault & Carroll and Andrew R. Martinez, all of New Orleans, for appellant.

Benjamin Y. Wolf, of New Orleans, for appellee.

McCALEB, Judge.

The plaintiff, Marcus Joseph Fegan, was employed as First Mate on the Steamship West Tacook. He had made a voyage to England and was on his way back to the United States when he was injured on board the ship. He has filed suit on two causes of action against the defendant ship-owners, Lykes, Bros. Steamship Company, Inc., for the injuries he received—the first being brought under the Jones Act, 46 U.S.C.A. § 688, which extends to seamen the rights conferred upon railway employees engaged in interstate commerce, 45 U.S.C.A. § 51, and the second, under his maritime contract of employment, for recovery of maintenance and cure made necessary as a consequence of the accident.

The first cause of action, which is founded upon the alleged negligence of the defendant in failing to provide a safe place to work and safe appliances to work with, arises out of the following state of facts:

On May 13, 1938, while the S.S. West Tacook was about 80 miles south of South Pass on its return voyage from England to Beaumont, Texas, the plaintiff was directed by the master of the vessel to fire a Lyle gun. Acting in accordance with these instructions, he prepared the gun for firing—that is, he lashed and supervised the lashing of the gun, prepared the charge of powder, loaded the gun with the powder, inserted the projectile in the gun, and fired it. When the gun was fired, it broke loose from its lashings, struck the overlap of the deckplate, inflicted a dent therein and broke off one of the angle irons which was connected to its carriage when some of the rivets sheered off from this blow. The course of the gun was thereby deflected which caused it to strike the plaintiff on his right leg and, as a result, he sustained painful and permanent bodily injuries.

Plaintiff alleges that the accident was caused through the negligence of the defendant because the Lyle gun was approximately 20 years old and in a dangerous condition; that there was a crack between the trunnion and the muzzle of the gun which was running rust and that it did not have the appliances prescribed by the United States Department of Commerce in that it was not equipped with rings, eyebolts, or other efficient devices fitted to its carriage for securing it properly in a position for firing. He further avers that the injuries he received have resulted in his permanent incapacity to pursue his vocation as seaman and that he is entitled to recover damages in the sum of $52,625.-24.

In addition to the claim for damages, plaintiff seeks to recover under his maritime contract of employment the sum of $6,813.33 for maintenance and cure.

The answer of the defendant admits that plaintiff was employed as first mate on its ship and that he was injured as a result of firing the Lyle gun under instructions of the ship's captain. It denies, however, that the accident occurred through its negligence and it sets forth specifically that the Lyle gun was in good order and condition at the time the plaintiff fired it. It further avers that the accident was caused solely through plaintiff's negligence, in that he failed to cause the gun to be properly lashed before he fired it and also carelessly and negligently loaded it with an excessive amount of powder and that, as a result thereof, the gun kicked back, broke from its lashings and struck the plaintiff, causing him to be injured. It further alleged that, at the time the plaintiff fired the gun, he was standing in an improper and unsafe place and that the injuries sustained by him are due to his own carelessness.

In the alternative, the defendant alleged that, if it should be found that it was at fault in any respect, then plaintiff was guilty of contributory negligence barring his recovery and again, alternatively, that plaintiff's contributory negligence should be considered in fixing the amount of the damage he sustained. In addition to the foregoing, the defendant further pleaded, in the alternative, that the accident to the plaintiff was the result of risks normally incident to his employment aboard the vessel for which it is not liable.

After a trial on the foregoing issues before a jury, there was a verdict (by a nine to three vote) in favor of plaintiff for the sum of $10,000 damages for the injuries sustained by him and he was also awarded the sum of $4,800 for maintenance and cure under his maritime contract. A judgment was entered on the verdict and the defendant has prosecuted this appeal from the adverse decision. The plaintiff has answered the appeal and prays that the award given him in the court below be increased to the amount sued for.

■ ■ The law of this case is not seriously disputed. The main claim, which is based upon the negligence of the defendant, is brought under the provisions of the Jones Act, 46 U.S.C.A. § 688, the pertinent part of which provides as follows: "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; * * *."

By the foregoing provisions, certain parts of the Federal Employers' Liability Act, 45 U.S.C.A. § 51, regulating actions for personal injuries by employees against railroads have become embodied in the

maritime law. Under that statute and the applicable decisions of the state and federal courts, the action of the seaman, must be predicated upon the negligence of the defendant and it is incumbent upon him to prove fault by a preponderance of evidence. See San Antonio etc. R. Co. v. Wagner, 241 U.S. 476, 36 S.Ct. 626, 60 L. Ed. 1110; Southern Railway Co. v. Gray, 241 U.S. 333, 36 S.Ct. 558, 60 L.Ed. 1030; New Orleans & North Eastern RR Co. v. Harris, 247 U.S. 367, 38 S.Ct. 535, 62 L.Ed. 1167; and Asprodites v. Standard Fruit & Steamship Co., 5 Cir., 108 F. 2d, 728. It is further to be observed that the defenses of contributory negligence and assumption of risk are not available as bars to recovery under the statute but they are to be given consideration in determining the amount of damages to be allowed. See Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265.

Accordingly, the only question to be resolved with respect to the defendant's liability is whether the Lyle gun itself was unsafe or whether the defendant failed to supply all of the necessary and appropriate appliances in order that the plaintiff might fire the gun with reasonable safety. The undisputed facts of the case reveal the following:

The Department of Commerce of the United States Government has issued regulations which require that vessels, such as the West Tacook, be equipped with a Lyle gun and projectiles. The Lyle gun is part of the safety equipment of the vessel and is of cannon muzzle loading type. It is used for casting a line to assist in rescue work, or as an aid to vessels when in distress. The regulations require the gun to be fired not less than every three months and records covering the firing must be entered in the log book of the vessel. These firings are known as gun drills. The firing of the gun is required to be made by the chief officer or any other officer of the vessel designated by the master. The amount of powder to be used in one of these drills should be half the amount of what is known as a service charge or three or four ounces. The maximum amount of powder to be used at any time—that is, in time of distress when the Lyle gun is used for other purposes—should never exceed eight ounces.

On May 13, 1938, the plaintiff was instructed by the master of the vessel to fire the Lyle gun. In accordance therewith, the plaintiff ordered two seamen, Kinker and McDonald, to remove the gun from the box in which it was housed on the bridge of the vessel to the starboard side of the bridge deck. When it had been thus removed, the plaintiff lashed the gun to a four-inch water pipe with a new piece of three and one-half inch manila rope. He then sent one of the seamen for powder and powder bags to be used in the firing of the gun. A one-pound can of powder was delivered to him which, he says, was about one-fourth full. There were no powder bags aboard the vessel and the third mate on the bridge furnished material for the making of a powder bag. Kinker, one of the seamen assisting the plaintiff, sewed up the bag and when this was complete, the plaintiff took the contents of the can and poured it into the improvised bag. After this was done, he inserted the powder bag into the gun barrel and also placed the projectile therein. The plaintiff then had three or four primers delivered to him and he attached a lanyard to these primers for the purpose of firing the gun. At first, he was unsuccessful in firing the gun as he states that the primers would bend and break out of the primer hole when he pulled the lanyard. On the third or fourth attempt, however, the powder ignited and the gun went off. As the powder exploded, the gun broke loose from its lashings and shot backwards across the deck. In so doing, the gun carriage caught on a seam in the deck and the gun, in turning over, struck the plaintiff on his right hip. The gun went on past No. 3 hatch and finally landed against some steam pipes on the port side, traveling a distance of approximately 28 feet from where it was lashed.

After the accident, the plaintiff was transferred to another vessel which brought him to New Orleans for medical treatment. The West Tacook proceeded on to its destination at Beaumont, Texas, where it was examined by the local inspectors of the United States. These inspectors also conducted an investigation of the accident. In due course, the inspectors, who made the examination, delivered their report to Captain Andrew A. Miranda and Hugh F. Cobb, local inspectors at Galveston, Texas, acting as a "C" Marine Board of Investigation. On the evidence submitted to these inspectors, they, acting as a board, made certain findings and recommendations in the case in which they determined the cause of the accident and

resulting injuries to the plaintiff. This report was submitted by them on June 21, 1938, to the Director of the Bureau of Marine Inspection and Navigation of the Department of Commerce at Washington, D. C., and, on August 16, 1938, the Director of the Bureau wrote a letter approving the findings and recommendations of the "C" Marine Board of Investigation.

At the trial of the case, the defendant submitted the evidence of the local inspectors who made an investigation of the accident as well as the testimony of Captain Miranda, who was one of the officers comprising the "C" Marine Board of Investigation. It is the opinion of this Board and of the inspectors making the examination that the Lyle gun broke loose from its lashings because the plaintiff, in preparing the charge to be fired in the gun, used entirely too much gun powder. When the case was tried below, the defendant sought to introduce in evidence the findings of the "C" Marine Board of Investigation and also the approval of those findings by the Director of the Bureau of Marine Inspection and Navigation. This evidence was objected to by counsel for plaintiff on the ground that the hearing had by the Board was ex parte and that neither plaintiff nor his counsel was notified to appear at the same notwithstanding that the regulations provide that he should be given an opportunity to be heard. The judge of the trial court sustained this objection, being of the opinion that the report and findings of the United States Inspectors constituted merely hearsay, evidence.

It is the plaintiff's contention that the record in this case demonstrates that the defendant was guilty of negligence in many particulars. The evidence presented by him consists of his own testimony and that of Kinker, a seaman, and Hanson, a boatswain, who were present at the time the gun was lashed and fired. The statements of the last two named witness substantially corroborate plaintiff's testimony as to the manner in which the gun was lashed and fired.

Plaintiff claims that the fact that the gun broke loose from its lashings and injured him establishes negligence on the part of the defendant (1) in that no proper inspection of the device and its appliances was made by the United States Inspectors at the time of the annual inspection of the vessel; (2) that there is no evidence in the record to indicate that the gun was ever given a thorough inspection since it was put on the ship; (3) that the gun was rusty and contained a considerable amount of pitting in its muzzle; (4) that it was not equipped with the latest safety appliances prescribed by the United States Department of Commerce for all guns which have been in service since 1920; (6) that the master of the vessel violated the regulations in that he failed to drill the crew in the use of the gun; (7) that there were no powder bags containing the proper amount of powder on the vessel as required by the regulations; (8) that the primer hole on the gun was defective in that it was not protected by a beaming, coaming or projection extending above the wall of the gun not less than one-half inch as prescribed by the regulations and (9) that the gun was not equipped with rings, eyebolts or other efficient devices for securing it in a position for firing.

We have made a careful investigation of the foregoing claims of the plaintiff and have been unable to find that any of them are sustained by proof. The evidence submitted by the defendant, consisting of the testimony of Captains Miranda and Lambkin, the United States Local Inspectors, Captain Ward, the master of the vessel, and A. J. Labate, the second mate, discloses to our satisfaction that the gun, while an old one, had been properly inspected and was in good condition. The fact that there was considerable pitting in the muzzle of the gun could have no effect whatsoever upon its recoil at the time it was fired forasmuch as the expert testimony reveals that the presence of pitting would lessen the compression caused by the insertion of the projectile.

Plaintiff's complaint that the primer hole of the gun was not protected by a beaming or a coaming has likewise no connection whatever with the accident as we are unable to discern that the absence of the projections had anything to do with the recoil of the gun at the time it was fired. The regulations only require that such projections be placed on guns which were manufactured after June 30, 1920, and it is obvious that they were prescribed solely for the purpose of facilitating the ignition of the powder. The evidence shows that the gun in question has been in use since the year 1919 and is the same approved type as that in use on many other vessels.

We also fail to find any merit in plaintiff's complaint that the master of the ves-

sel was not present at the time the gun was fired as the testimony submitted by the defendant shows that it was plaintiff's duty to fire the gun when requested to do so by the master and that, as first officer, he was supposed to be fully acquainted with the approved methods of lashing and firing the device.

Plaintiff also says that the gun was not properly equipped with rings, eyebolts or other efficient devices for securing it in a position for firing. The testimony of the government inspectors is, however, to the effect that the gun was equipped with all of the appliances required by the regulations.

Finally, it is said that the defendant was negligent in that it did not supply the vessel with powder bags containing no more than five ounces of black powder as required by the United States regulations. An examination of the 52nd Supplement to the General Rules and Regulations of the Department of Commerce dated June 18, 1935, reveals that it is not necessary for the vessel to be equipped with powder bags. It is merely recommended in the regulations that powder bags should be furnished to the vessel. The defendant's witnesses state that it is the custom to keep the powder to be used in firing the Lyle gun in one-pound cans and that material is generally furnished by the vessel for the making of powder bags.

■■ Notwithstanding the assertion of the plaintiff that he used a charge not exceeding two and one-half or three ounces of powder in firing the gun, we are of the belief that he is mistaken in his testimony. In truth, we think that the underlying cause for the extraordinary recoil of the gun was the use by the plaintiff of an excessive charge of powder. This is the opinion of the "C" Marine Board of Investigation and of the Director of the Bureau of Marine Inspection and Navigation. The district judge refused to permit these findings to be introduced in evidence. We think he was in error in so doing because the reports of the "C" Board and the Director of the Bureau are public documents. Under Title 28, U.S.C.A. § 661, it is provided that copies of books, records, papers or documents in any of the executive departments of the United States shall be admitted in evidence equally with the originals thereof when duly authenticated under the seal of the department. And, in the case of United States of America v. United Fruit Company and S. S. Abangarez, 60 F.2d 543, Judge Borah of the United States District Court for the Eastern District of Louisiana, held that the findings of the local inspectors in a collision case are in the nature of public documents and are therefore admissible as an exception to the hearsay rule. Of course, it is to be recognized that this type of evidence is not binding on the court and can be disregarded if it is found that it is unsupported by other proof.

■ In its letter to the Director of the Bureau of Marine Inspection and Navigation, the "C" Marine Board of Investigation declared: "Assistant Inspectors examined the gun and equipment and could find no apparent defect * * * It is the opinion of this Board that the chief mate in preparing the charge used entirely too much powder. The fact that the lashings carried away and the distance the gun kicked back, leaves no doubt in our minds that this was the case. The firing of the gun was part of the mate's duties and the size of charges used was entirely under his control, and we consider the accident was the result of the chief mate's carelessness."

In the letter of the Director of the Bureau of Marine Inspection and Navigation dated August 16, 1938, in which he approved the findings of the "C" Marine Board of Investigation, he states as follows: "As it is obvious from an analysis of the testimony that the casualty was due to the chief officer using a quantity of powder in excess of normal, a duty he, under the present regulations, should understand and be qualified in, no blame, therefore, can be attributed to other parties, licensed or otherwise, and under these circumstances you are directed to close this case without further action."

A careful review of all of the evidence, considered in connection with the physical facts of the case, satisfies us that the conclusions set forth by the "C" Marine Board of Investigation and the Director of the Bureau of Marine Inspection and Navigation in the foregoing letters reveal the real and only cause of the accident and we are convinced that the regrettable injuries sustained by the plaintiff are attributable to his own neglect. It was plaintiff's duty to prove, by a preponderance of evidence, that the defendant was guilty of some fault having causal connection with the accident and since he has failed to do so we are compelled to dismiss his suit for damages.

■ With regard to plaintiff's action for the recovery of maintenance and cure, we find that he has failed to submit any evidence upon which the verdict of the jury for $4,800 may be sustained. The record shows that, after the accident, plaintiff was taken to the Marine Hospital in New Orleans where he remained as an inpatient from May 14, 1938, until November 16, 1938, at no expense to him. Since November 16, 1938, until the date of trial, November 8, 1939, he has been receiving treatment as an outpatient, without cost to him, at the Marine Hospital. It therefore follows that, inasmuch as plaintiff has been furnished all necessary medical attention by the defendant, his claim for cure must be rejected. See The Bouker No. 2, 2 Cir., 241 F. 831; wherein cure is declared to be synonymous with the rendition of medical assistance.

The plaintiff is, of course, entitled to recover for his maintenance during the time he is being treated by his physician. The evidence shows that he has received maintenance from his employer during the time he was confined to the Marine Hospital,—that is, he received his food and lodging at the defendant's expense from the date of his injury until the time he became an outpatient of the hospital on November 16, 1938. He is therefore entitled to recover a reasonable sum to defray his maintenance from November 16, 1938, when he became an outpatient, until he is discharged by the physicians treating him. It appears from the testimony of Dr. Lane, who was rendering medical services to the plaintiff at the time of the trial, that plaintiff's condition has not become static and that it is reasonable to believe that he will improve with further treatment.

The leading case on the question of the recovery of maintenance by a seaman is that of Calmar Steamship Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 655, 82 L.Ed. 993, where the Supreme Court held that the award of a lump sum in anticipation of the continuing need of maintenance and cure for life or for an indefinite period could not be countenanced and that "The seaman's recovery must therefore be measured in each case by the reasonable cost of that maintenance and cure to which he is entitled at the time of trial, including, in the discretion of the court, such amounts as may be needful in the immediate future for the maintenance and cure of a kind and for a period which can be definitely ascertained."

■ As we have above stated, the facts of this case show that the plaintiff is entitled to recover for his maintenance from November 16, 1938, until the date of trial on November 8, 1939, or until such time as he is either cured or his condition becomes static. Maintenance, as we understand it, means a reasonable allowance for plaintiff's board and lodging during the period of his illness. No proof whatsoever has been submitted by him to establish the amount necessary for his upkeep since he has become an outpatient of the hospital. The only evidence offered by him is that he earns a salary of over $200 per month as first mate and that he has a wife and two children dependent upon him for support. The salary which he earned on the vessel does not constitute any part of the cost of his board and lodging and therefore it afforded to the jury no justifiable ground for the basis of the verdict for maintenance and cure.

In view of the absence of proof, we would ordinarily be required to dismiss plaintiff's claim for maintenance and cure as of nonsuit. We feel, however, that, in the interest of justice, the case should be remanded to the trial court for the purpose of giving plaintiff the opportunity of offering such evidence as he might be able to produce to show the expense for maintenance to which he is entitled. It is also probable that, on the remand of the matter, plaintiff's physician will be able to fix with certainty the time during which he will be required to receive treatment.

For the reasons assigned, the judgment appealed from, insofar as it awards damages to the plaintiff under the Jones Act, 46 U.S.C.A. § 688, is annulled, avoided, and reversed, and it is now ordered, adjudged, and decreed that the plaintiff's suit be and it is dismissed at his cost.

It is further ordered, adjudged, and decreed that the judgment appealed from, insofar as it awards to the plaintiff the sum of $4,800 for maintenance and cure, is annulled, avoided, and reversed, and it is now ordered, adjudged, and decreed that plaintiff's case on this claim be and it is remanded to the Civil District Court for the Parish of Orleans for further proceedings according to law and consistent with the views herein expressed. Cost of this appeal to be paid by the plaintiff, Marcus Joseph Fegan, other costs to await the final determination of the cause.

Reversed in part.

Reversed and remanded in part.