254 So.2d 108 (1971)
Mrs. Imogene HOCUT, Plaintiff-Appellee,
v.
INSURANCE COMPANY OF NORTH AMERICA, Defendant-Appellant.
No. 3582.
Court of Appeal of Louisiana, Third Circuit.
October 22, 1971.
Rehearing Denied November 23, 1971.
Writ Refused January 17, 1972.
*109 Scofield & Bergstedt, by John B. Scofield, Lake Charles, for defendant-appellant.
Jones & Jones, by J. B. Jones, Jr., Cameron, for plaintiff-appellee.
Before FRUGÉ, MILLER and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
This is a suit by Mrs. Imogene Hocut, prosecuted under the Jones Act, 46 U.S.C. A. § 688, for the wrongful death of her husband, Joe Chester Hocut, allegedly drowned while in the course of his employment on the M/V F.A.R. Horizons. The only defendant, Insurance Company of North America, was impleaded under the direct action statute, La.R.S. 22:655, as the liability insurer of F.A.R. Trawlers, Inc. owner of the vessel. Originally the suit also involved claims of unseaworthiness under the general maritime law, and Mrs. Hocut's major children were additional parties plaintiff, however all but the *110 Jones Act claim of Mrs. Hocut were dismissed with prejudice on motion of plaintiff's counsel.
In late January, 1970, the shrimping vessel F.A.R. Horizons, measuring 68.5 feet in length, 22.1 feet in width, and 11.3 feet in depth, under the command of Captain Jules Lancon, made port in Cameron, Louisiana and her entire crew quit. Because he had recently applied for a position on the F.A. R. Horizons, Captain Lancon called Joe Hocut in Freeport, Texas and offered him employment on his vessel. Hocut accepted the employment and together with his wife, the plaintiff herein, traveled to Cameron. They were unable to locate a place to live in Cameron however, and so the plaintiff returned to Freeport. Hocut was assigned quarters on board the vessel and given the only key thereto.
For some five days Lancon and Hocut worked on the vessel making her ready for a fishing expedition, they being unable to leave port due to heavy fog, and Hocut spent the nights on board. Finally on January 30, it appeared as though the weather would soon clear and therefore Captain Lancon told Hocut to be prepared to sail early the next morning. Hocut assured Lancon that he would be sleeping on the boat so there would be no problem with his being there, and requested a $25.00 advance on his pay. Captain Lancon obtained the requested advance from a local fish company and delivered it to Hocut at a lounge where the latter had gone to drink. Lancon then went to his home, leaving Hocut in the lounge.
The son of Captain Lancon, Bill Lancon, testified that he saw Hocut in the aforementioned lounge sometime between three and five o'clock that afternoon and that when he went home around eight o'clock, Hocut was still there and was "feeling his beers". That was the last time that any witness saw Hocut alive.
When Captain Lancon went to his boat the next morning, Hocut was not there and the boat was locked. The Captain enlisted the aid of a local police officer and searched the town for Hocut, but without success. He considered Hocut a responsible individual and he remained in port for approximately one week during which time he searched for Hocut and had the adjoining water churned by tugboats, but there was no sign of him.
On February 12, 1970 Shelton LeBlanc, an employee of the fish company where Lancon had obtained the advance given to Hocut, saw the latter's body floating in the water some seventy-five yards from the docks where the F.A.R. Horizons had been moored on the night of his disappearance. At that moment LeBlanc was ordered to do a chore by his employer, and not being certain that the object he had seen floating was in fact a body, he performed his assigned task and then ate his lunch before going out to investigate. When he did so, the body had been carried farther from the docks by the current and by the time it was recovered it had drifted farther still.
Clayton Nunez, the Wild Life & Fisheries agent who recovered the body, testified that when the body was put ashore, a pack of cigarettes fell from the shirt pocket and that some of the papers in Hocut's wallet were still dry in the center. The body, he said, had no marks on it whether from crabs or other causes, and was not too swollen. He also testified that there are no crabs in the winter, that bodies rise only when they decompose, that the low temperature of the water would tend to preserve the body, and that at the time there were four other bodies in the area, that had been submerged for two weeks.
The parish coroner, Dr. Cecil W. Clark, examined the body immediately upon its removal from the water and made a subsequent examination by x-ray in a hospital. The doctor testified that the body was distended and had apparently been under water for several days. The x-ray examination showed water in the lungs but did not show any broken bones nor was there any other evidence of trauma or violence. The *111 cause of death therefore, was diagnosed as drowning.
Trial was had by a jury which returned a general verdict in favor of plaintiff in the amount of $50,000.00. The trial judge reduced that award by the amount of the deductible in defendant's policy, $250.00, and rendered judgment in favor of plaintiff for $49,750.00. Defendant appealed that judgment to this court.
We deem it proper to point out, before beginning our discussion of the issues herein, that the scope of our review in Jones Act cases is the same as that accorded the Federal appellate courts. Trahan v. Gulf Crews, Inc., La.App., 246 So.2d 280; and cases cited therein. In Gallick v. Baltimore and Ohio Railroad Company, 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618, the Supreme Court of the United States in quoting from Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520 defined those limits as follows:
"`It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. Washington & Georgetown R. Co. v. McDade, 135 U.S. 554, 571, 572, 10 S.Ct. 1044, 1049, 34 L.Ed. 235; Tiller v. Atlantic Coast Line R. Co., supra, 318 U.S. [54] 68, 63 S.Ct. [444] 451 [87 L. Ed. 610], 143 A.L.R. 967; Bailey v. Central Vermont Ry., 319 U.S. 350, 353, 354, 63 S.Ct. 1062, 1064, 87 L.Ed. 1444. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.' 321 U.S., at 35, 64 S.Ct. at 412."
In Trahan v. Gulf Crews, Inc. supra, we quoted from Rogers v. Missouri Pacific Railway Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493, thusly:
"It is no answer to say the jury's verdict involved speculation or conjecture * * * Only where there is a complete absence of probative facts to support the conclusion reached does a reversible error appear * * * the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." (Emphasis added) Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916.
The scope of our review of this case, then, is severely limited by federal law and we shall confine ourselves within those limits in examining the jury's verdict.
The jury rendered a general verdict and one of the errors specified by defendant is the court's refusal to submit the case on special interrogatories as requested by it.
The decision of whether or not a case will be submitted to the jury on special interrogatories is one resting exclusively within the discretion of the trial judge and there is no mandatory requirement that a case be thus submitted because a party requests it. La. Code of Civil Procedure, Articles 1811-1812; Mulkey v. Aetna Casualty and Surety Company, La. App., 210 So.2d 897. There is therefore no merit to defendant's contention, but we are left without specific knowledge of the jury's determinations and accordingly we must look to see if the essential elements *112 for recovery under the Jones Act were reasonably established.
The learned trial judge correctly instructed the jury that those elements require: 1) that at the time of his death, Hocut was in the service of the vessel, F. A.R. Horizons, and, 2) that his death was caused in whole or in part by the negligence of the officers, agents or employees of F.A.R. Trawlers, Inc., the owner of the vessel. (Although the trial judge used the term "service of the vessel" rather than the proper term under the Jones Act, "course of employment", these terms were held to be the equivalent of one another in Braen v. Pfeifer Oil Transportation Co., 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed.2d 191.)
On the first point, whether Hocut was in the course of his employment when he drowned, the evidence establishes that he had been sleeping on the boat the previous few nights and that he expected to do so that night. Every indication is that although given to drink, a common diversion among seamen, Hocut was a responsible and reliable individual. Thus the fact that he knew he was to put out to sea the following morning is significant. He drowned, according to the medical testimony, several days before his body was found some 75 yards from where his vessel had been moored, and there is no hint in the record that he had any reason to go near the water except to board his vessel. There was no indication of foul play, and insofar as could be determined, his death was due solely to drowning. These are facts which when viewed in the light of the jury's discretion as set out in the above quotations, supply a basis from which it could reasonably conclude that Hocut had returned to the F.A.R. Horizons on the night in question and somehow, either in attempting to board her or subsequent to boarding her, fell into the water and was drowned.
Assuming that Hocut did indeed return to the F.A.R. Horizons that night, he did so in preparation for sailing early the following morning. In Braen v. Pfeifer Oil Transportation Co., supra, the United States Supreme Court held those rules of maintenance and cure cases which put a seaman in the service of his ship when first reporting for duty or when approaching or leaving the ship to be applicable to suits under the Jones Act for purposes of determining whether a seaman is in the course of his employment when injured.
Defendant calls our attention to, inter alia, the cases of Daughdrill v. Diamond M. Drilling Company, 5 Cir., 447 F.2d 781 and Sellers v. Dixilyn Corporation, 5 Cir., 433 F.2d 446, in which seamen injured on their way to and from their vessels were held not to be in the course of their employment. Those cases are clearly distinguishable from the one at bar. In Daughdrill the deceased was killed in an automobile accident some 100 miles from the vessel. In Sellers the plaintiff was injured some 250 miles from the coast while riding to his home in a truck owned and operated by a fellow employee. The vehicles in which they were riding were not provided by their employers nor did their employers compensate them in any way for their travel time. The seamen in both cases were offshore workers who spent a given number of days at their jobs, working, eating and sleeping on their offshore rigs and then were taken ashore and released for a given number of days. While ashore they were not subject to the call of duty, were free to do as they pleased, and had no connection with their employer whatsoever. Their pay began and ended at the dock.
The jury evidently found the deceased in our case to have been drowned in the immediate vicinity of his vessel while seeking to board her to sleep thereon pursuant to his master's permission and instructions. He had been working on the vessel each day for several days, preparing her to go to sea. Each night he slept on board with the consent of his employer in the quarters to which he was assigned by the latter. The Captain's action in allowing Hocut to sleep on board, though termed an accommodation *113 by defendant's counsel, was certainly a benefit to the vessel since, as said above, the vessel had lost her entire crew, and Hocut had been unable to locate lodging elsewhere in Cameron. His being provided with quarters on board assured the vessel of having a crew, an especially significant benefit on the night in question since she was scheduled to sail early the following morning.
The court in the Daughdrill case distinguished between it and other cases wherein the seaman was found to be in the course of his employment, such as when riding to or from work in an automobile furnished by the employer. We think our case is more akin to those distinguished by the Daughdrill court and accordingly we hold that the jury's verdict cannot be assailed on the ground that Hocut was not within the course of his employment when he was drowned.
With respect to the second point, the existence of negligence on the part of Hocut's employer proximately causing his death, we again find the evidence to justify the verdict of the jury under the aforementioned federal jurisprudence.
On the night of January 30, 1970 the F. A.R. Horizons was not moored directly to the dock, but rather was made fast to another vessel of comparable size, the American Lady, which lay between her and the dock. There was no gangway leading from the dock to the American Lady nor was there any between the two vessels. Obviously, if only because of the curvature of their sides, the two vessels could not have been touching at all points nor could the American Lady have been so situated in relation to the dock.
Additionally there was considerable evidence to indicate that the lighting on the docks was inadequate and that there were no lights at all on either of the vessels. The dock itself, which was viewed by the jury, had no railings of any sort, and some of the boards constituting its steps and platform were defective. (Some debris such as ropes, hoses, etc., was alleged to have been strewn about the docks, but the evidence indicates that most, if not all of this was in an area removed from where the F.A.R. Horizons was docked.)
Joe Hocut then, in order to reach his assigned bunk, was forced to go onto an ill-lighted dock and from thence across a vessel with no lights, unto his own likewise unlighted vessel. Adding to his peril was his evident consumption of copious quantities of alcoholic beverages, an activity not unknown to Hocut's employer.
We think therefore that the jury could, with reason, find the presence of negligence in not providing a reasonably safe means of boarding the vessel, at least contributing to Hocut's death. In Superior Oil Co. v. Trahan, 5th Cir., 322 F.2d 234, the court, in a footnote quoting from the opinion of the trial judge, stated that:
"* * * it is clear that where the evidence leads the fact finder to the conclusion that the employer's negligence played any part, even the slightest, in producing the injury or death for which damages are sought, the employer's liability attaches and recovery may be had." (Emphasis ours)
See also Ferguson v. Moore-McCormack Lines, 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed. 2d 515 quoting from Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493.
Of course the possibility of Hocut's intoxication would not be a bar to recovery, since in this type of case, contributory negligence serves only to reduce the quantum of damages. Fegan v. Lykes Bros., S.S. Co., Inc., La.App., 195 So. 392.
Besides its objections to the verdict of the jury, already dealt with above, defendant alleges certain errors on the part of the trial court in its efforts to obtain a reversal of the judgment.
First, defendant complains that seven of the twelve jurors were either *114 clients of plaintiff's attorney or had close relatives who were such. This, defendant says, gave a considerable advantage to plaintiff and it demands that we scrutinize this case with great care, if not that we reverse. We have scrutinized this case with great care as we do all cases that come before this court, and we do not find in this allegation of error a basis for reversal.
While the allegation concerning the seven jurors are true, and we can take judicial cognizance of the fact that the demographic composition of Cameron Parish makes such a jury not only possible, but likely, there has been no showing of any prejudice or partiality on the part of these men. Their presence on the jury, at worst, created what could well be a double edged sword and defendant has not shown that it swung his way or that he raised the shield of challenge for cause to stop it from doing so.
Defendant failed to challenge any of the complained-of jurors. In connection with applications for new trials based on the disqualification or incompetence of jurors, it has been held that the failure of a party to challenge the juror after knowing of his disqualification or incompetence works a waiver of the disqualification or incompetence. Rogge v. Cafiero, 15 La.App. 565, 131 So. 207; Stachlin v. Destrehan, 2 La. Ann. 1019; 66 C.J.S. New Trial § 23, p. 116. We see no reason to hold otherwise in the case at bar. Neither did defendant exercise his right under La. Code of Civil Procedure, Art. 122 to request a change of venue, should he find it impossible to obtain an impartial jury in Cameron Parish. There is therefore no merit in this contention.
Defendant argues that the trial judge erred in charging the jury on propositions of law which were not supported by the evidence. In view of the foregoing discussions, only one charge given by the judge was devoid of evidentiary support, this being his charge that any violation of a U.S. Coast Guard regulation would be evidence of negligence.
At 88 C.J.S. Trial § 382, p. 991 we find the following:
"* * * If an instruction not warranted by the evidence is calculated to mislead the jury and prejudice the objecting party it is fatal error; * * * but an instruction stating a correct proposition of law is not necessarily misleading or prejudicial, merely because it is inapplicable to the facts in evidence, * * * and where it is not prejudicial, it is not a fatal error. * * *"
It is true that there was no evidence of a violation of a Coast Guard regulation, but viewing the entire case we can hardly see how the instruction could have prejudiced the jury against the defendant. Clearly the jury had no need of finding such a violation to impose liability on the defendant. We therefore see no merit in this contention either.
Finally defendant complains that the Court erred in refusing to excuse an agent of the defendant company from the rule of sequestration. In this connection defendant quotes Article 1631 of the La. Code of Civil Procedure and comment (b) thereunder as follows:
"On its own motion the court may, and on request of a party the court shall, order that the witnesses, other than parties, be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interest of justice, the court may exempt any witness from its order. As amended Acts 1966, No. 36, § 1." (Emphasis added)
"(b) Since a corporation can only act through an agent, it is intended that a corporation's representative present at the trial is not to be excluded, even though he may be a witness in the case."
The agent, says defendant, was Captain Lancon, the only representative of F.A.R. Trawlers, Inc. who was present. What defendant *115 overlooks is that F.A.R. Trawlers, Inc. was not a party to the suit. Plaintiff sued defendant directly under La.R.S. 22:655, and therefore Captain Lancon was but a witness like any other and the question of whether he should be excluded was one resting within the sound discretion of the trial judge. We cannot say that he abused that discretion.
For the above and foregoing reasons the judgment appealed from is affirmed at appellant's costs in both courts.
Affirmed.
MILLER, Judge (dissenting).
I would remand this case for a new trial.
The trial court abused its discretion in refusing to submit the case to the jury on special interrogatories.
This decision to affirm hangs by a thin thread. The issue would be seriously in doubt if this court reviewed the facts as well as the law. I agree that we cannot review the facts. Trahan v. Gulf Crews, Inc., 246 So.2d 280 (La.App. 3 Cir.1971). Writ of review granted. 258 La. 913, 248 So.2d 585 (1971).
Had this Jones Act case been tried in the Federal Courts which have concurrent jurisdiction with the State Courts, a unanimous verdict (instead of 9 of 12) would be required; the Federal Judge could comment to the jury on the facts (whereas the State Judge cannot); the Federal Judge could grant a directed verdict (whereas the State Judge cannot); the jury venire would come from a broader segment of the population; and special interrogatories are more likely to be used in the Federal Courts. Brown, Federal Special Verdicts: The Doubt Eliminator, 44 F.R.D. 338, 343.
Perhaps some of these advantages are procedural rather than substantive. If so the Louisiana Courts will continue to apply Louisiana's procedural rules. If the Federal rules provide protective devices not found in the State rules, this might account for plaintiff's choice of forum. If the plaintiffs can get the best of two sets of rules by filing in the State Courts, common sense dictates that he must choose the State Courts.
I would hold that for the trial of Jones Act cases, the Louisiana Courts must apply the Federal rules for the conduct of jury trials. To hold otherwise is to take away substantive rights of one or more parties.