# HOMER RAMSDELL TRANSPORTATION COMPANY *v.* LA COMPAGNIE GÉNÉRALE TRANSATLANTIQUE.

**CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.**

No. 166. Argued March 6, 1901.—Decided May 27, 1901.

The statutes of New York impose compulsory pilotage on foreign vessels inward and outward bound to and from the port of New York by way of Sandy Hook.

In an action at common law the shipowner is not liable for injuries inflicted exclusively by negligence of a pilot accepted by a vessel compulsorily.

THIS was an action at law, brought by the Homer Ramsdell Transportation Company, a corporation of New York, against the Compagnie Générale Transatlantique, a corporation of the Republic of France, to recover damages caused by the defendant's steamship, the Bretagne, striking and injuring the plaintiff's pier in New York harbor.

The answer alleged, among other things, "that at the time of the said collision the said steamship La Bretagne was in the command, and her movements and navigation entirely under the orders and direction, of a pilot, duly licensed under, and compulsorily imposed upon the defendant by the authority of the State of New York; and that the regular officers and crew of the said steamship in the service of the defendant had no part in the navigation of the said steamer except to carry out or execute the orders of the said pilot, which they did promptly and efficiently in every particular."

The case was referred by the Circuit Court of the United States for the Southern District of New York to Hon. William G. Choate, who reported in favor of the defendant, and filed an opinion published in 63 Fed. Rep. 848. That court gave judgment on his report for the defendant; and the plaintiff appealed to the Circuit Court of Appeals for the Second Circuit, which certified to this court, together with the pleadings, the judgment

of the Circuit Court, and the report and opinion of the referee, the following statement of facts and questions of law :

" The defendant in error is a foreign corporation, owning and plying a regular line of steamers between Havre and New York. On the morning of December 10, 1892, one of the defendant's steamers, La Bretagne, while outward bound from the port of New York to Havre by way of Sandy Hook, with cargo and passengers, struck the plaintiff's pier, damaging it to the amount of upwards of thirteen thousand dollars. The said vessel, at the time she left her pier, was in all respects seaworthy and properly manned, equipped and supplied, and her owner exercised due diligence to make her so. She had on board a Sandy Hook pilot, duly licensed under and pursuant to the laws of the State of New York, and was navigated under his direction up to the time of said collision, and all his orders were promptly and efficiently obeyed and carried out by the master, officers and crew of said steamship. The said collision and the damage resulting therefrom were caused solely by the negligence and want of skill and care on the part of the said pilot, and not by any want of skill or negligence on the part of the master, other officers, or crew of the said steamship.

" Certain questions of law arise in the cause concerning which the court desires the instructions of the Supreme Court for its proper decision, and which are as follows :

" First. Whether the provisions of chapter 467 of the laws of New York passed June 28, 1853, as amended by chapter 196 of the laws of said State passed April 11, 1854; chapter 243 of the laws of the said State passed April 3, 1857; chapter 930 of the laws of the said State passed May 16, 1867, and chapter 548 of the laws of said State passed May 2, 1870, and consolidated into sections 2093 to 2123, inclusive, of chapter 410 of the laws of said State passed July 1, 1882, impose compulsory pilotage on foreign vessels inward and outward bound to and from the port of New York by way of Sandy Hook, in view of the decisions of the New York Court of Appeals.

" Second. Whether in an action at common law the shipowner is liable for injuries inflicted exclusively by negligence of a pilot accepted by a vessel compulsorily."

*Mr. William H. Harris* for plaintiff in error.

*Mr. Edward K. Jones* for defendant in error.

MR. JUSTICE GRAY, after stating the case, delivered the opinion of the court.

The question whether the statutes of the State of New York impose compulsory pilotage on foreign vessels inward and outward bound to and from the port of New York by way of Sandy Hook depends, as both counsel admit, upon the true construction of the provisions which are copied in the margin.[1]

[1] The statute of 1854, c. 196, § 2, reënacted in the statute of 1882, c. 410, § 2100, provides that the commissioners of pilots "shall have the power to regulate the stationing of pilot boats for the purpose of receiving pilots from outward bound vessels, may alter or amend any existing regulations of pilots, and make and duly promulgate and enforce new rules or regulations, not inconsistent with the laws of this State, or of the United States, which shall be binding and effectual upon all pilots licensed by them, and upon all parties employing such pilots. They may declare and enforce forfeitures of pilotage upon any mismanagement or neglect of duty by the pilots licensed by them; they may declare and impose and collect fines and penalties not exceeding two hundred and fifty dollars for each offence, to prevent any of the pilots licensed by them from combining injuriously with each other, or with other persons, and to prevent any person licensed by them from acting as a pilot during his suspension, or after his license may be revoked; and the said commissioners may establish and enforce all other needful rules and regulations for the conduct and government of the pilots licensed by them, and the parties employing them; and they may enforce and receive accounts of all moneys collected for pilotage by the pilots licensed by them, and may impose and collect from such pilots a sum not exceeding three per cent on the amount thereof, to defray their necessary expenses, including clerk hire and office rent."

By the statute of 1867, c. 930, also reënacted in the statute of 1882, c. 410, § 2100, "Any pilot bringing in a vessel from sea shall, by himself or one of his boat's company, be entitled to pilot her to sea when she next leaves the port, unless in the mean time a complaint for misconduct or incapacity shall have been made against such pilot, or one of his boat's company, and proved before the board of commissioners of pilots; provided, however, that if the owner of any vessel shall desire to change such pilot, then the said commissioners may assign any other pilot in the same pilot boat to pilot said vessel to sea."

The statute of 1857, c. 243, reënacted in the statute of 1882, c. 410, § 2119, after providing how the master of a vessel sailing under a coasting license to or from the port of New York by the way of Sandy Hook, " desirous of piloting his own vessel," may obtain a license for such purpose from the commissioners

---

The statute of 1857, c. 243, reënacted in the statute of 1882, c. 410, § 2119, provides as follows:. " If the master of any vessel above one hundred and fifty and not exceeding three hundred tons burthen, and owned by a citizen of the United States, and sailing under a coasting license to or from the port of New York by the way of Sandy Hook, shall be desirous of piloting his own vessel, he shall first obtain a license for such purpose from the commissioners of pilots, who are hereby authorized and required to grant the same, if such master shall after an examination had by said commissioners be deemed competent; which said license shall be and continue in force one year from the date thereof, or until the determination of any voyage during which the license may expire. For such license, the master to whom it shall be granted shall pay to the said commissioners four cents per ton. All masters of foreign vessels and vessels from a foreign port, and all vessels sailing under register, bound to or from the port of New York by the way of Sandy Hook, shall take a licensed pilot, or, in case of refusal to take such pilot, shall himself, owners or consignees, pay the said pilotage as if one had been employed, and such pilotage shall be paid to the pilot first speaking or offering his services as pilot to such vessel. Any person not holding a license as pilot under this act, or under the laws of the State of New Jersey, who shall pilot, or offer to pilot, any ship or vessel to or from the port of New York by the way of Sandy Hook, except such as are exempt by virtue of this act, or any master or person on board a steam-tug or towboat, who shall tow such vessel or vessels, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by a fine not exceeding one hundred dollars or imprisonment not exceeding sixty days; and all persons employing a person to act as pilot, not holding a license under this act, or under the laws of the State of New Jersey, shall forfeit and pay to the board of commissioners of pilots the sum of one hundred dollars."

By the statute of 1854, c. 196, § 5, reënacted in the statute of 1882, c. 410, § 2120, " Any person not holding a license as pilot under this act, or under the laws of the State of New Jersey, who shall pilot or offer to pilot any ship or vessel to or from the port of New York by the way of Sandy Hook, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by a fine not exceeding one hundred dollars or imprisonment not exceeding sixty days; and all persons employing a person to act as pilot not holding a license under this act, or under the laws of the State of New Jersey, shall forfeit and pay to the board of commissioners of pilots the sum of one hundred dollars."

of pilots, provides that every master of a foreign vessel bound
to or from the port of New York by the way of Sandy Hook
"shall take a licensed pilot, or, in case of refusal to take such
pilot, shall himself, owners or consignees, pay the said pilotage
as if one had been employed, and such pilotage shall be paid to
the pilot first speaking or offering his services as pilot to such
vessel." It then goes on to provide that "any person not hold-
ing a license as pilot under this act," or under the laws of New
Jersey, who shall pilot any vessel to or from the port of New
York by the way of Sandy Hook, shall be punished by fine or
imprisonment, and that "all persons employing a person to act
as pilot, and not holding a license under this act," or under the
laws of New Jersey, shall pay a fine.

By these provisions, not only is the master of a foreign vessel
required to take a licensed pilot, or, in case of refusal to take
such pilot, required to pay pilotage to the pilot first offering his
services; but the subsequent provision as to any "person not
holding a license under this act," construed in connection with
the previous provision as to licensing the master of a coasting
vessel as its pilot, evidently includes the master of a foreign
vessel, and subjects him to fine or imprisonment if he pilots his
own vessel.

The requirement to take a licensed pilot or pay pilotage, to-
gether with the penalty imposed on a master who pilots his
own foreign vessel, clearly impose compulsory pilotage. And
it was held by this court in *The China*, (1868) 7 Wall. 53, that
the statute of 1857 imposed such pilotage.

The statute of 1867, c. 930, reënacted in the statute of 1882,
c. 410, § 2100, enacts that a pilot bringing in a vessel from sea,
may by himself or one of his boat's company, pilot her to sea
when she next leaves the port; provided that if the owner shall
desire to change the pilot, the commissioners of pilots may as-
sign another one of the same pilot boat. But the right of the
owner to object to one pilot does not make the selection of an-
other by the commissioners a voluntary act of his.

The cases in the New York Court of Appeals, cited by the
plaintiff, do not affect this question. In *Brown* v. *Ellworth*,
(1875) 60 N. Y. 249, the only point decided was that a pilot

licensed by the law of New Jersey could not recover pilotage under the statute of New York. And in *Gillespie* v. *Zittlosen,* (1875) 60 N. Y. 449, the only point decided was that the pilot first offering his services could not recover pilotage if the master took another licensed pilot.

The answer to the first question certified must therefore be that the statutes of New York do impose compulsory pilotage on foreign vessels inward and outward bound to and from the port of New York by the way of Sandy Hook.

This action is at common law. It is not, and, being for damages inflicted on land, could not be, in admiralty. *The Plymouth,* (1865) 3 Wall. 20.

At common law, no action can be maintained against the owner of a vessel for the fault of a compulsory pilot.

In *Carruthers* v. *Sydebotham,* (1815) 4 M. & S. 77, 85, Lord Ellenborough, in holding that the act of the pilot was not the act of the master or mariners or owner of the ship, said: " Now to make the pilot the representative of the master, and consequently to exempt the underwriter from liability for his acts, it must first be shown that there is a privity between the pilot and the master, so that the one may be considered as the representative or agent of the other. But does the master appoint the pilot? Certainly not. The regulations of the general pilot act impose a penalty upon the master of every ship which shall be piloted by any other person then a pilot duly licensed, within any limits for which pilots are lawfully appointed. And there is an exception of such places for which pilots are not appointed. But if the master cannot navigate without a pilot except under a penalty, is he not under the compulsion of law to take a pilot? And if so, is it just that he should be answerable for the misconduct of a person whose appointment the provisions of the law have taken out of his hands, placing the ship in the hands and under the conduct of the pilot? The consequence is, that there is no privity between them."

In *Attorney General* v. *Case,* (1816) 3 Price, 302, 322, in the Court of Exchequer, the master of the vessel whose owners were held liable, as the court said, " was not compellable, at that time, in any way, either under the penalty of double the wages,

or of paying even the single wages, to have any pilot on board. It was his own act to have him; and it can be only in the case of such an officer having been forced upon them, and without his own election, that the responsibility of the owner can possibly be discharged."

In *The Maria*, (1839) 1 W. Rob. 95, 106, Dr. Lushington, on a full review of those cases, held that upon general principles, and independently of the express provisions in the English statutes, the compulsory taking of a pilot relieved the owner from all responsibility for his acts.

In *Lucey* v. *Ingram*, (1840) 6 M. & W. 302, 315, Baron Parke, delivering the judgment of the Court of Exchequer, spoke of the exemption of the master who was compelled to take a pilot, from liability by the common law independent of statute, as follows: "It may, indeed, be admitted, that in many of the cases, the judges, in giving their judgments, refer to the obligation of the master to take a pilot, as the ground on which his irresponsibility is founded; and no doubt that is the foundation, and probably the only foundation, on which it can rest independently of the statutes; but the language of the exempting clause in the last pilot act certainly carries the doctrine further, and it may well be conceived that this extension of the common-law doctrine was not accidental, but intentional. The object of the legislature, in establishing pilots, has been to secure, as far as possible, protection to life and property, by supplying a class of men better qualified than ordinary mariners to take charge of ships in places where, from local causes, navigation is attended with more than common difficulty. To effect this object, it has in general been made the duty of the master of every ship, on arriving at any of the places in question, to take a pilot on board, and to give up to him the navigation of the vessel. The master, however well qualified to conduct the ship himself, is bound under a penalty in a great measure to divest himself of its control, and to give up the charge to the pilot. As a necessary consequence, the master and owners are exempted from responsibility for acts resulting from the mismanagement of the pilot." He then proceeded to consider the extension of the exemption by statute, which has no bearing on this case.

In *The Halley*, (1868) L. R. 2 P. C. 193, 201, the Judicial Committee of the Privy Council agreed with Sir Robert Phillimore in the same case in the Court of Admiralty, L. R. 2 Ad. & Ec. 3, " in his statement of the common law of England, with respect to the liability of the owner of a vessel for injuries occasioned by the unskillful navigation of his vessel, while under the control of a pilot, whom the owner was compelled to take on board, and in whose selection he had no voice; and that this law holds that the responsibility of the owner for the acts of his servant is founded upon the presumption that the owner chooses his servant and gives him orders which he is bound to obey, and that the acts of the servant, so far as the interests of third persons are concerned, must always be considered as the acts of the owner."

There is no occasion to refer further to the English cases in admiralty, because in England it is held that the ship is not responsible in admiralty, where the owner would not be at common law, differing in this respect from our own decisions. *The China*, 7 Wall. 53; *Ralli* v. *Troop*, (1894) 157 U. S. 386, 402, 420; *The John G. Stevens*, (1898) 170 U. S. 113, 120–122; *The Barnstable*, (1901) 181 U. S. 464.

In *The China*, affirming the decision of the Circuit Court in admiralty, the liability of a vessel *in rem* for a collision from the fault of a compulsory pilot was put upon the maritime law, the court saying: " The maritime law as to the position and powers of the master, and the responsibility of the vessel, is not derived from the civil law of master and servant, nor from the common law." " According to the admiralty law, the collision impresses upon the wrongdoing vessel a maritime lien. This the vessel carries with it into whosesoever hands it may come. It is inchoate at the moment of the wrong, and must be perfected by subsequent proceedings." " The proposition of the appellants would blot out this important feature of the maritime code, and greatly impair the efficacy of the system. The appellees are seeking the fruit of their lien." 7 Wall. 68.

Such was the view of that case taken by the whole court in *Ralli* v. *Troop*, in which the majority of the judges said of it: " That decision proceeded, not upon any authority or agency

of the pilot, derived from the civil law of master and servant, or from the common law, as the representative of the owners of the ship and cargo;" "but upon a distinct principle of the maritime law, namely, that the vessel in whosesoever hands she lawfully is, is herself considered as the wrongdoer liable for the tort, and subject to a maritime lien for the damages." 157 U. S. 402. And the dissenting judges said that in *The China* "this court held, contrary to the English, but conformably to the continental authorities, that a vessel was liable for the consequences of a collision through the negligence of a pilot taken compulsorily on board, although it was admitted that, if the action had been at common law against the owner, and probably also *in personam* in admiralty, there could have been no recovery, as a compulsory pilot is in no sense the agent or servant of the owner." 157 U. S. 423.

In none of the cases in which actions at law have been maintained against the owner of a ship for the fault of a pilot was the owner compelled to employ the pilot.

In *Bussy* v. *Donaldson*, (1800) 4 Dall. 194, in the Supreme Court of Pennsylvania, an action on the case was brought against the owner of a ship for damages by collision; and the defence that the ship "was in the charge of a public pilot of the port (a person not the choice, nor the voluntary agent, of the owner) when the injury was committed," was overruled. But the statute of Pennsylvania, cited in that case, simply provided that the pilot first offering himself to any inward bound ship should be entitled to take charge of her; and that, if the master of any ship should refuse or neglect to take a pilot, the master, owner or consignee, should forfeit and pay a sum equal to half pilotage, to the use of the society for the relief of distressed and decayed pilots, their widows and children. Penn. Stat. April 11, 1793, §§ 8, 10; 3 Dall. Laws, 424, 426. The subsequent pilot laws of Pennsylvania have made similar provisions. *Cooley* v. *Board of Wardens*, (1851) 12 How. 299. And the Supreme Court of Pennsylvania has held that they did not make the employment of a pilot compulsory, saying: "The legislature have wisely decided not to compel the owners to supply one, but have permitted them, if they please, to compound by

paying half pilotage, for the benevolent and beneficial purpose of relieving distressed and decayed pilots, their widows and children.   The act sets out an inducement to avail themselves of their services, but does not compel them to do so."   *Flanigen* v. *Washington Ins. Co.*, (1847) 7 Penn. St. 306, 312.   And see *The Creole*, (1853) 2 Wall. Jr. 485, 516, 517.

So in *Williamson* v. *Price*, (1826) 4 Martin (N. S.) 399, the Supreme Court of Louisiana maintained an action for a collision by a vessel "at the time under the care and consequently the control of a licensed pilot."   But the statutes of Louisiana, likewise, only provided that "if the master of any ship or vessel coming to the port of New Orleans shall refuse to receive on board and employ a pilot, the master or owner of such ship or vessel shall pay to such pilot, who shall have offered to go on board and take charge of the pilotage of the vessel, half pilotage."   Law of Territory of Orleans of March 31, 1805, § 17, p. 140 ; Louisiana Rev. Stat. 1853, p. 457, § 17 ; Rev. Stat. 1856, pp. 403, 404, §§ 9, 19.   And this court has held that those statutes are not compulsory.   *The Merrimac*, (1871) 14 Wall. 199, 203.

In *Yates* v. *Brown*, (1829) 8 Pick. 22, in the Supreme Judicial Court of Massachusetts, in which the owners of a vessel were held liable for a collision by the fault of a pilot, it is only stated that he was duly authorized to pilot the ship, that he held his commission under the executive authority of the Commonwealth, and that the owners had selected him for this service.   And in Massachusetts, as has been observed by its court, "the statute does not make it incumbent on the master of a vessel, subject to pilotage, to receive a pilot, if he chooses to navigate her himself," although it makes him and the owner liable to pay full pilotage fees if a pilot offers his services and they are refused. *Martin* v. *Hilton*, (1845) 9 Met. 371, 373.

In *Denison* v. *Seymour*, (1832) 9 Wend. 1, in the Supreme Court of New York, the taking of a pilot was not compulsory, and the court said: "The officer here called the pilot is not the same as the pilot recognized in the laws regulating foreign commerce."

In *Atlee* v. *Packet Co.*, (1874) 21 Wall. 389, which was a suit

*in personam* in the admiralty, where the owners of a vessel were held liable for the fault of a pilot, it does not appear that they acted under compulsion in appointing him, and the question of their liability for his acts was not discussed.

In *Sherlock* v. *Alling,* (1876) 93 U. S. 99, the case came to this court on writ of error from the Supreme Court of the State of Indiana, and therefore none but Federal questions were within the jurisdiction of this court; and the only questions decided, or which could have been decided, were that an act of Indiana making any person liable for the death of another caused by his wrongful act or omission was not, as applied to a tort committed on navigable waters within the State, an encroachment on the commercial powers of Congress; and that an act of Congress making the master and owners of a vessel liable for injuries to passengers under certain circumstances afforded no defence to the action.

The liability of the owner at common law for the act of a pilot on his vessel is well stated by Mr. Justice Story in his Treatise on Agency, (2d ed.) § 456*a:* "The master of a ship, and the owner also, is liable for any injury done by the negligence of the crew employed in the ship. The same doctrine will apply to the case of a pilot, employed by the master or owner, by whose negligence any injury happens to a third person or his property; as, for example, by a collision with another ship, occasioned by his negligence. And it will make no difference in the case, that the pilot, if any is employed, is required to be a licensed pilot; provided the master is at liberty to take a pilot, or not, at his pleasure; for, in such a case, the master acts voluntary, although he is necessarily required to select from a particular class. On the other hand, if it is compulsive upon the master to take a pilot, and, *a fortiori,* if he is bound to do so under a penalty, then, and in such case, neither he, nor the owner, will be liable for injuries occasioned by the negligence of a pilot; for, in such a case, the pilot cannot be deemed properly the servant of the master or the owner, but is forced upon them, and the maxim, *Qui facit per aliam facit per se,* does not apply."

The answer to the second question must therefore be that in

an action at common law the shipowner is not liable for injuries inflicted exclusively by negligence of a pilot accepted by a vessel compulsorily.

*Answer to the first question in the affirmative; to the second in the negative.*