**TEXACO TRINIDAD, INC., Texaco International Trader, Inc. and Texaco, Inc.**

v.

**AFRAN TRANSPORT COMPANY.**

Civ. A. No. 80–1773.

United States District Court, E. D. Pennsylvania.

May 11, 1982.

On May 7, 1979, plaintiff Texaco Overseas Tankship, Ltd., was the voyage charterer of the AFRAN BREEZE, which is the ship owned by defendant Afran Transport Company. The AFRAN BREEZE at all times relevant to this case was a steel, single screw tanker of 9,540 dead-weight tons, having sixteen cargo tanks and a bridge, quarters, and aft machinery. The vessel was powered by a diesel engine of 21,000 brake horsepower, and at all times relevant to this case, the AFRAN BREEZE was owned by defendant Afran Transport Company and registered under the flag of Liberia.

At all relevant times as well, plaintiff Texaco International Trader, Inc. ("Trader") and plaintiff Texaco, Inc. ("Texaco") were the owners of various crude oil cargoes carried by vessels chartered or subchartered to Trader or Texaco and to be refined at a certain refinery located at and known as Texaco Trinidad. In some instances this cargo was trans-shipped to the United States.

Now, on May 7, an important date in this case, Texaco Trader was the sub-voyage charterer of the AFRAN BREEZE. It also owned the cargo aboard the vessel at that time, which was cargo destined for Texaco Trinidad's installation in Trinidad.

On that day, at approximately 0230 hours in the morning, the AFRAN BREEZE arrived at Point-a-Pierre, Trinidad, where she was to commence a discharge procedure. The discharge involved, in turn, a certain mooring procedure which would allow the cargo of crude oil to be delivered to its ultimate destination, the Texaco Trinidad refinery storage installation.

The SPM buoy, which is a single point mooring buoy, is a buoy that is located offshore. It is intended to receive from tankers which are too large to moor alongside of a normal pier. This type of buoy is designed to allow those deep draft tankers and large tankers to unload under a procedure that permits the tanker to come near

Edward V. Cattell, Jr., Philadelphia, Pa., Louis P. Sheinbaum, New York City, for plaintiff.

James F. Young, Thomas Fisher, III, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BECHTLE, District Judge.

This case, now before the Court for disposition on the issue of liability only, arose out of the collision on May 7, 1979 between a deep-draft tanker and a mooring buoy off the coast of Trinidad. What follows are the Court's findings of fact and conclusions of law solely on the issue of liability.[1]

Plaintiff Texaco Trinidad, Inc. ("Texaco Trinidad") was the owner and operator of a certain SPM buoy and refinery at Point-a-Pierre in Trinidad.

---

1. This is an edited version of the transcript of the Court's findings of fact and conclusions of law delivered from the bench. It is not intended to amend or modify in any way the Court's previous ruling. If a discrepancy exists, however, this edited version shall control.

the buoy and hook up to the buoy. Its cargo can be unloaded through the buoy; and then, through a series of hoses and pipes, be transported to a shoreside location without the ship having to enter into a shallow setting where these large tankers simply cannot navigate when fully loaded. This ship was fully loaded at the time.

This particular SPM buoy had two 24-inch diameter hoses for receiving the crude oil and one 12-inch diameter hose for supplying bunker or fuel oil to the vessel itself.

The buoy in question in this case was located four and a half miles off the coast of Trinidad in approximately 88 feet of water. It was held in position by six mooring chains spaced in equal intervals around the buoy and extending approximately 700 feet out from the buoy, where these chains are then secured to pilings driven into the seabed. The pilings are approximately one hundred feet long and are driven into the seabed until the top of the piling is 70 feet below the level of the bottom. The cargo and the bunker hoses from the buoy are connected through an undersea manifold to fixed pipelines running along the ocean bottom, onto the shore, and into the refinery.

At approximately 0330 hours on May 7, 1979, the AFRAN BREEZE anchored at the Point-a-Pierre anchorage, which is the first step in the procedure that would ultimately—as was expected and intended—bring the ship closer to the SPM buoy and indeed would allow the ship through certain maneuvers to allow its cargo to be discharged through the buoy in the mechanism that has previously been described by the Court.

A little later on that day, at 1000 hours on May 7, 1979, Texaco Trinidad's SPM Coordinator, Percy Cruikshank, boarded the AFRAN BREEZE to explain the mooring operations at the SPM buoy to the vessel's chief officer and also to insure that the vessel's lines and mooring equipment were prepared for the anticipated mooring operation. The job of the SPM Coordinator, in addition to this introductory obligation, is also to advise a pilot during the mooring operation of the distance and bearing of the SPM buoy as requested by the pilot during the vessel's approach to the buoy. Further, at such time as the vessel will arrive at the buoy with the vessel stopped dead in the water, the mooring master would advise the chief mate with respect to taking the large mooring lines and securing them to the vessel. Thereafter the coordinator would direct the Texaco Trinidad rigging crew in the attachment of the cargo hoses to the manifold of the AFRAN BREEZE.[2]

During the approach to the buoy, it was the duty of Cruikshank to communicate directly to the pilot the location of the buoy in relation to the vessel's bow. If based on certain observations certain vessel maneuvers are required, it would be the duty of, in this instance, Cruikshank on the bow and other representatives—Mr. Duff and others—in the water, through a coordinated effort, to allow the pilot to have a full knowledge of the relationship between the approaching vessel and the buoy.

The principal figure on behalf of the plaintiffs on the bow of the ship was Mr. Cruikshank. And his principal role was to talk to, that is, communicate with, the pilot. The pilot in turn would then convey to the master or highest level official of the ship on the bridge a variety of orders, suggestions, and commands in order to assure that the vessel would approach the buoy in such a way as to allow the cargo to be unloaded without injury or damage to the property or persons in and about the entire mooring operation.

2. There is either some confusion or ambiguity in the testimony—minor if we understand it—in the cross-use of some of the terms "mooring coordinator," "mooring master," "mooring supervisor," and the like. The Court will make its findings by referring to the names of the persons rather than to what their title may have been. In most instances, Cruikshank is referred to as a coordinator; but in some instances he has been referred to as a mooring master, and Duff has been referred to as a mooring supervisor; but there is some crossover in that. The Court's findings will be what the Court believes the evidence suggests the persons' roles or responsibilities were to the extent that the testimony made that clear, as the Court believes it did.

Now, the person that had Mr. Cruikshank's job, which I will refer to as the job of "coordinator," in the normal procedure was furnished a walkie-talkie portable radio which operates on Channel 6 for these SPM operations. On this particular day Mr. Cruikshank had such a radio in his possession. Other persons involved have these radios as well. The pilot in this instance did not have such a radio, although it is customary and regular and normal procedure for the pilot to be furnished such a radio. Also it is customary for the radio to be tested before the pilot leaves shore and takes his position on the ship to undertake piloting operations, and for the pilot to communicate with the coordinator or other persons associated with the mooring procedure—but especially with the coordinator in the bow of the ship.

At 1150 hours on the same day, the AFRAN BREEZE weighed anchor to proceed to the SPM buoy of Texaco.

At 1205 hours on that same day, Pilot James came on board the AFRAN BREEZE and proceeded to the bridge and took control of the navigation of the vessel in the direction of the SPM buoy.

The use of a pilot such as James in mooring the AFRAN BREEZE was required by Texaco Trinidad. The vessel would not have been permitted under Texaco Trinidad's regulations and procedures to moor at the SPM buoy without the use of a properly-licensed pilot. The use of such a pilot in mooring at Texaco's SPM buoy was not required under any Trinidad law or by force of any government regulation or requirement of any kind other than the requirement of Texaco.

The pilot, in this instance Pilot James, is considered to be the head of the mooring team required and supplied by Texaco Trinidad to take over and navigate the AFRAN BREEZE in its approach and mooring to the SPM buoy. The team included Cruikshank in the bow together with various other personnel assigned to small launches in the water in order to handle mooring lines, hose, and perform other duties associated with this mooring procedure.

On May 7, 1979, as has been stated before, Pilot James did not have in his possession a portable radio because Texaco did not supply him one. This was known by the marine operations assistant, the person employed by Texaco Trinidad who assigned the pilot to this vessel and furnished other information concerning the impending mooring procedure.

The ship did have a radio, as it can be assumed all ships do, that was available in the wheelhouse and which had a capability to be tuned to the same channel, that is, Channel 6. Inasmuch as this radio is located in the wheelhouse, while the pilot performs his duties in respect to navigating the vessel to the buoy from the wing of the bridge—a position beyond the wheelhouse—the ship's radio was not an adequate substitute for a hand-carried portable radio.

Consequently, during the vessel's approach to the SPM buoy, Pilot James did not have any direct radio communication at any time with Cruikshank or anyone else on the bow.

The bridge of this vessel is located on the stern of the vessel, at least 700 feet from the bow. Because of this location, it was deemed essential in approaching the SPM buoy for Cruikshank to relay distances and bearings in regard to that mooring buoy to the pilot on the bridge. While it was common because of the manner in which these ships are constructed and their size to lose sight of the SPM buoy by persons on the bridge when the vessel had approached within 1500 feet, the Court believes that the pilot in this instance did not lose sight of the buoy. Nevertheless, it was unsafe for a vessel such as this to approach the SPM buoy without direct communication between the pilot and in this instance Mr. Cruikshank on the bow.

The Court also finds that Pilot James was aware that adequate communication between him and Mr. Cruikshank or such other person who would have that bow responsibility was an essential element, if success of any mooring operation was to be assured without damage to person or property.

Nevertheless, Pilot James proceeded to function as the pilot, to bring about the mooring of the AFRAN BREEZE to this SPM buoy on this day without the necessary and customarily-required communication between him and Cruikshank.

As the AFRAN BREEZE approached the SPM buoy, at a distance of approximately a half a mile from it, Cruikshank sensed that the vessel was proceeding too rapidly and attempted to communicate this fact to the bridge. He was unsuccessful. Shortly thereafter, seeing no reduction in the vessel's rate of approach, he again urged the pilot to place the vessel full astern in an attempt to stop before it would come in contact with the buoy. From a position on board a launch in the water, Mooring Supervisor Duff—who was also furnished, in keeping with normal practices and procedures of Texaco, with a Channel 6 portable radio—communicated with Cruikshank two or three times and urged him to tell the pilot to go full astern.

The vessel meanwhile continued to approach the buoy and Cruikshank, realizing that he had no communication and apparently would have none, approached the vessel's chief officer and asked him to communicate with the bridge. The chief officer did so on a different channel; and on the advice that there be an immediate full astern, the chief officer contacted the master on the bridge, who immediately ordered the engines full astern.

It seems plain from a review of the various documents and consideration of the testimony as a whole that for this brief series of seconds, there was momentary confusion on the bridge which the Court finds was caused by the assumption of navigational control by the master, resulting from what can be said to be some emergency communications from the chief officer. It must be kept in mind that this confusion was then transmitted by the engine orders to the engine room and resulted in a circumstance where engines were stopped and then placed full astern. The Court does not credit the various elements of testimony suggesting that the cause of the accident was engine failure, that is, that the ship was in any way unseaworthy.

At 1246 hours on the same day, the AFRAN BREEZE, proceeding on this course, came in contact with one of the anchor chains of the SPM buoy. The SPM buoy was pulled into the bow of the AFRAN BREEZE, and damage resulted. The anchor chain cut into the bow of the vessel, and the buoy as well as the vessel experienced some damage by reason of this contact. Thereafter, the anchor chain itself was pulled free from its mooring piling, causing damage to the piling, and necessitating its replacement. Thereafter the vessel stopped, backed off, and then proceeded to anchor.

The Court believes that the causes of the collision with the SPM buoy included, first, the failure of Cruikshank to have an adequate radio check or confirmation with the pilot, with whatever radio communication the mooring team had elected to use, and that radio check and confirmation should have occurred prior to and during the approach of the vessel to the SPM buoy.

Another cause was the failure of Cruikshank, immediately upon discovery of difficulty in communication, to select an alternate means of communication through the chief officer who was available as an alternative means of prompt communication.

The actual cause of the collision, resulting in turn from the negligence in not having proper communication, was that the vessel proceeded to the mooring point at an excessive speed under all the circumstances. This resulted in the inability of the vessel to slow and stop in a timely manner, and would have been avoided had there been communication between Cruikshank and the pilot.

Another cause related but separately stated is the failure of the plaintiffs to supply Pilot James with a portable radio and allowing James to undertake the management of this mooring procedure without a radio.

Now, the principal legal point that warrants discussion has to do with whether or

not Pilot James was a compulsory pilot as that term is used in the law of admiralty. The importance of the question to this case is whether or not any fault of the pilot is attributable to the defendant, Afran Transport Company, as vessel owner.

 Usually a ship owner is liable for negligence or negligent acts committed by a voluntary pilot. *See Homer Ramsdell Transportation Co. v. La Compagnie Generale Transatlantique*, 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155 (1901). That authority stands for the proposition that the pilot, that is, a voluntary pilot, is regarded as the servant of the ship owner. However, that case also teaches us that a ship owner is not liable *in personam* for the negligence or fault of a compulsory pilot.

It appears to be true that under existing case law a pilot has been held to be a compulsory pilot only where the requirement is imposed by law. Authority for that is the *Homer* case as well as *People of State of California v. Italian Motorship Ilice*, 534 F.2d 836 (9th Cir. 1976) and *Hogge v. SS YORKMAR*, 434 F.Supp. 715 (D.Md.1977). No case has been cited by either party, though, nor has the Court found a case, that discussed whether or not a pilot could be held to be compulsory when the requirement is imposed by a source other than a governmental entity. This then becomes a critical issue for the Court to decide— whether or not under these circumstances the compulsory pilot rationale should nevertheless extend to a circumstance where the pilot is on board, whether or not there is any application of a rule or regulation or statute.

In determining whether the compulsory pilotage exception to the ship owner's liability *in personam* applies in this case, we have to examine the reason behind the rule. In *Homer*, the Supreme Court explained that the ship owner is not liable for the fault of a compulsory pilot because when the employment of the pilot is under compulsion of law, a true relation of master and servant does not exist and the doctrine of respondeat superior is not applicable. *See also* J. Griffin, American Law of Collision 193, at

443–444 (1949). In those jurisdictions where there is a lawful requirement for a pilot to manage the mooring responsibility, *Homer* tells us that:

> [t]he object of a legislature, in establishing [such] pilots, has been to secure, as far as possible, protection to life and property, by supplying a class of men better qualified than ordinary mariners to take charge of ships in places where, from local causes, navigation is attendant with more than common difficulty. To effect this object, it has in general been made the duty of a master in every ship, on arriving at any of the places in question, to take a pilot on board, and to give up to him the navigation of the vessel. The master, however well qualified to conduct the ship himself, is bound under a penalty in a great measure to divest himself of its control and to give up the charge to the pilot. As a necessary consequence, the master and owners are exempted from responsibility for acts resulting from the mismanagement of the pilot.

*Homer Ramsdell Transportation Co. v. La Compagnie Generale Transatlantique, supra*, 182 U.S. at 412, 21 S.Ct. at 834, *quoting Lucey v. Ingram*, 6 M & W. *Homer* also points out that if it is compulsive upon the master to take a pilot, and if he is bound to do so under a penalty, then and in such case neither he nor the owner will be liable for injuries occasioned by the negligence of a pilot. *Id.* at 416, 21 S.Ct. at 835. In such a case, the pilot cannot be deemed properly the servant of the master or the owner but is forced upon them.

While we do not have a statute or a law requiring a pilot in this instance, nevertheless the principle would appear to be the same. While there is no criminal or monetary penalty embodied in the statute, there is a penalty of not being able to deliver the ship or deliver the cargo to its intended destination. That is to say, if the pilot is not accepted by the master, the only reasonable conclusion that can be drawn on the record of this case is that the ship is not permitted to moor and unload or indeed

engage in anything other than presumably anchorage or departure from the area governed by the party imposing the requirement.

In this case, the evidence is clear that Texaco Trinidad required ships mooring at the SPM buoy to take a pilot—and for good reason. These buoys, it is quite plain, represent the investment of a considerable amount of resources in their placement, management, and use, as well as a need to accommodate the deep-draft vessels that allow this particular refinery to function. Common sense would suggest that Texaco has an interest not only in the property, but also in the operation of its refinery and the safety of personnel engaged in the delicate and important and often difficult task of fulfilling a mooring operation in such waters.

The record is plain as well that these pilots were considered to be local experts in regard to local conditions. It is this very type of requirement that *Homer* speaks of. It cannot be said, therefore, that Afran had any choice but to accept the pilot provided by Texaco. Afran was entitled to have a pilot that was prudently equipped and prudently advised, and who functioned in a way that would assure that his local expertise would prevent injury to property or persons associated with the mooring procedure.

The Court does not believe that the fact that Texaco Trinidad is not a governmental entity is dispositive. Indeed many of Texaco Trinidad's interests are the same as those that governmental entities have when compulsory pilotage is considered. The principal interest, of course, is in preventing damage to its own property. That is a direct proprietary interest in having competent pilotage. Secondly, there is the interest in having successful and expeditious operations in mooring so that Texaco Trinidad will gain maximum use from the facilities that are installed, in this instance, the SPM buoy. There is also an interest in preventing injury to persons involved, irrespective of whom those persons are employed by. The interest in preventing injury or death

to persons involved in these procedures can be said to be an interest that would support the need by Texaco to have a local expert become the pilot and take over the navigation of a vessel, especially vessels of this size.

Whether Afran Transport Company, through its employees, actually knew of Texaco Trinidad's requirements does not affect the result. Certainly if a pilot were required by law and the captain did not know of that law and took a pilot on anyway, the pilot would nevertheless be held compulsory. His status wouldn't change because of the knowledge of the master. Indeed, in a compulsory pilotage circumstance, it can be said to be likely that a master would invite and want and insist himself or herself on a pilot because of the other considerations the Court has mentioned.

So it is not the knowledge of the master that counts; it is the status of the person who boards as pilot that counts. That status is required by the person who is receiving the mooring or docking operation. It is compulsory whether that requirement comes from law or whether it comes from the manager of the land or the area involved. In this instance, therefore, Pilot James can be said to have been a compulsory pilot.

Pilot James, together with other members of the mooring team from Texaco which the Court has outlined before, were negligent principally by reason of the inability to communicate as the ship approached the SPM buoy. For these reasons, the Court finds that Afran Transport Company is not liable for the negligence of Pilot James or any of the other personnel for whom James was responsible and who can be said to be in the plaintiff's mooring team.

This case is within the admiralty jurisdiction of this Court under 28 U.S.C. § 1333. Although there may be an initial presumption of fault against the AFRAN BREEZE for striking a fixed object, that presumption has been successfully rebutted by the existence of plaintiff's own negligence as

the Court has outlined above, as well as the negligence of those for whom plaintiff Texaco Trinidad was responsible. The collision was caused by the negligence of Texaco Trinidad, Inc. in failing to properly equip Pilot James, the pilot that Texaco Trinidad selected, and the failure of that pilot to fulfill his duties as leader of the Texaco Trinidad, Inc. mooring team in a non-negligent manner.

Pilot James, from the viewpoint of the parties to this case and under the record in this case, was a compulsory pilot for whose acts Afran Transport Company should not be held liable *in personam*.

The Court believes that the full astern and emergency full astern engine orders and the various responses that were executed after the vessel had been placed *in extremis* by the failure of communication between the pilot and the mooring master were or can be said to be evidence of confusion and disorientation between the pilot and Cruikshank by reason of the failure of communication. In respect to this, there is no responsibility on Afran Transport Company or any of its personnel. That is to say, under all the circumstances, the conduct of the master and the crew of the AFRAN BREEZE when they became aware that the vessel was in an emergency circumstance, and all the actions taken, were under all those circumstances reasonable and non-negligent.

The Court does not believe that the plaintiff has fulfilled its burden in proving that any action taken by the vessel could have prevented the collision or that the vessel was in any way unseaworthy, or that it malfunctioned in any way. Accordingly, Texaco Trinidad, Inc. is fully liable for all damages caused by and resulting from the collision of the AFRAN BREEZE with the SPM facility.