**MORANIA NO. 4, INC. and Morania Oil Tanker Corp., Plaintiffs,**

**v.**

**TUG McALLISTER SISTERS, her engines, boilers, etc., in rem, and McAllister Brothers, Inc., in personam, and United States of America, Defendants and Third–Party Plaintiffs,**

**v.**

**M/V MELVIN H. BAKER, her engines, boilers, etc., in rem, Seaways Shipping Co. and Skaarup Shipping Corporation, Third–Party Defendants.**

No. 89 Civ. 7916 (RPP).

United States District Court, S.D. New York.

Nov. 15, 1991.

Kenny, Stearns & Broderick by Stephen J. Buckley, New York City, for plaintiffs.

Hill, Betts & Nash by Arthur J. Blank, Jr., New York City, for defendants and third-party plaintiffs Tug McAllister Sisters and McAllister Bros., Inc.

Torts Branch, Civ. Div., U.S. Dept. of Justice by John G. Schulmeisters, New York City, for defendant and third-party plaintiff U.S.

Walker & Corsa by Christopher Mansuy, New York City, for third-party defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT P. PATTERSON, Jr., District Judge.

### FINDINGS OF FACT

1. This is a case of admiralty and maritime jurisdiction in which the parties have

requested the Court to make findings of fact and conclusions of law on the issue of liability only. Trial was held on August 12, 13, 14, 15, 1991.

2. At all times hereinafter mentioned, plaintiff Morania No. 4, Inc. was and still is a corporation organized and existing under and by virtue of the laws of the State of Delaware with an office and place of business at 136 East 57th Street, New York, New York 10012 and was the owner of the barge MORANIA 440. Morania Oil Tanker Corp. was the operator of the MORANIA 440.

3. The MORANIA 440 is a tank barge, built in 1980, 5044 gross tons, 396 feet in overall length and 72 feet in breadth. On May 23, 1989, the MORANIA 440 was loaded with gasoline to drafts forward in brackish water of 20 feet, 6 inches and aft of 22 feet, 6 inches. When proceeding in fresh water in the Hudson River above Kingston, New York, her drafts increased 5¾ inches so the draft forward was about 21 feet and aft 23 feet.

4. At all times hereinafter mentioned, defendant McAllister Brothers, Inc. was and still is a corporation organized and existing under and by virtue of the laws of the State of Delaware with an office and place of business at 17 Battery Place, New York, New York 10004 and was the owner and operator of the McALLISTER SISTERS ("SISTERS").

5. The SISTERS is a tug built in 1977, 186 gross tons, 114.9 feet in overall length, 33 feet in breadth and powered by a diesel engine of 3900 horsepower.

6. At all times hereinafter mentioned, third party defendant Seaways Navigation Corp. was and still is a foreign corporation organized and existing under and virtue of the laws of Liberia and was and still is the owner of the motor vessel MELVIN H. BAKER ("BAKER").

7. At all times hereinafter mentioned, the third party defendant Skaarup Shipping Corporation was and still is a domestic corporation doing business in New York and was and still is the operator of the BAKER.

8. The BAKER is an ore carrier, 10194 gross tons, 524 feet, 11 inches in overall length and 75 feet, 6 inches in breadth, powered by a diesel engine capable of developing 7360 horsepower.

9. At all times hereinafter mentioned, United States of America, was and still is a sovereign state, which by Act of Congress of March 9, 1920 (46 U.S.C.App. §§ 741–752) known as the Suits in Admiralty Act, 1920, as amended and supplemented, has consented to be sued in admiralty on the cause of action hereinafter set forth.

*The Actions of the SISTERS*

10. On May 23, 1989, the SISTERS was properly made fast in the notch on the stern of the loaded barge MORANIA 440 and got underway from Citgo, Linden, New Jersey at about 0140 hours, May 23, 1989, bound up the Hudson River for Citgo, Albany.

11. The SISTERS' assigned captain was Captain Codd who was not the regular pilot or captain of the SISTERS. The SISTERS' regular captain, Captain Graham, was also aboard, but was not licensed for the trip to Albany and lacked sufficient experience to pilot the SISTERS with tow to Albany. Captain Codd was sufficiently licensed and had the required trips for the waters to Albany; his experience towing loaded barges in the Hudson River, including the MORANIA 440 on a regular basis, was about 90 round trips north of Beacon, New York.

12. On May 23, 1989, Captain Codd took charge of the SISTERS and tow from 0140 to 0320, then rested until 0600 and remained officer-in-charge until 1800 hours when the SISTERS and the MORANIA 440 arrived at the CITGO dock in Albany.

13. Earlier, on the late afternoon of May 23, 1989, Captain Codd, accompanied by Captain Graham, was on watch in the SISTERS' pilothouse steering the flotilla on full ahead, about 8 knots in the water. Captain Codd made radio security calls advising of the flotilla's presence at the City of Hudson, at 1600 hours, and at Fourmile Point, at around 1620. Around 1620, he heard a security call from the BAKER indicating she was getting underway from

Ravena, New York and would proceed southbound down the Hudson River.

14. At the time, the weather was overcast, visibility was good, there was a wind out of the northwest of about 10–15 knots and a flood current of about 2 knots. Tide level was plus 2.6 feet.

15. The SISTERS' chart in use was the current Chart 12348, 29th edition, dated September 7, 1985 published by the National Oceanic and Atmospheric Administration, U.S. Department of Commerce; the chart was opened in the pilothouse, but Captain Codd, with good visibility and being familiar with the river and the chart, did not refer to it.

16. The SISTERS was not equipped with a Fathometer, although other tugs of McAllister were so equipped.

17. At about 1640 when the SISTERS was in the vicinity of buoy 30 and buoy 34, Captain Codd first sighted the downbound BAKER about two miles away at the start of the New Baltimore–Matthew Point Range. (McAllister Exh. F).

18. Captain Codd then called the BAKER on the radio telephone, proposed a one whistle, port-to-port passing and Captain Syvertsen of the BAKER agreed. At this time, Captain Graham and the deckhand on watch, Schweers, were also in the SISTERS' pilothouse with Captain Codd.

19. At about this time, Captain Codd executed a change of course of about fifteen degrees to port, reduced the SISTERS' speed from full ahead about 8 knots in the water to half ahead, about 4 knots in the water and then maneuvered the flotilla to her starboard side (east side) of the channel.

20. As the vessels closed in distance to a mile, Captain Codd's observations were that the BAKER had not slowed down for the passing and was approaching at about five degrees off the port side of his tow but on the east side of the channel and not on the west side of the channel.

21. The channel between buoy 34 and beacon 36 is a narrow channel.

22. Captain Codd made a second maneuver of the flotilla further to her starboard

to give the BAKER more room to the west side of the channel which left the SISTERS on the same heading north in line with buoys 34A and 38.

23. Captain Codd believed that buoys 34A and 38 marked the east limit of the navigation channel, or were within 25–35 feet of the channel's edge, and that there was at least 24.3 feet of water in the channel at mean low water up to the approximate location of the buoys.

24. With about 2.5 feet of water above mean low water at the material time due to the flood tide, there should have been about 26.3 feet of water at the east limit of the channel near buoy 34A and over 35 feet of water within the channel between buoy 34 and beacon 36. There would have been over 35 feet of water outside the channel within 35 to 100 feet around beacon 36. (McAllister Exh. Q).

25. No fixed aids to navigation in this immediate area of the river were ahead of the SISTERS as she proceeded upriver after making her port turn at buoy 34, other than beacon 36, that Captain Codd could use for navigational purposes, nor were there any range markers marking the middle of the navigation channel that he could use to determine his position in the channel as the BAKER was approaching the SISTERS; Captain Codd relied on beacon 36 and red nun channel buoys 34A and 38 which were ahead of the SISTERS for his estimated position in the channel with respect to the approximate east channel limit.

26. Captain Codd's estimate that the BAKER passed the SISTERS and MORANIA 440 on his side of the channel with about 30–35 feet between the BAKER and the barge understates the distance between the ships.

27. During the BAKER'S approach, Captain Codd did not blow a whistle signal to express doubt as to the BAKER'S intentions, nor did he attempt to reach the BAKER by VHF radio when he believed the BAKER was on his side of the channel. After the passing, Captain Codd did not complain or register a protest, nor did he

make a contemporaneous log entry about the conduct of the BAKER.

28. Captains Codd and Graham and deckhand Schweers did not sense any grounding of the barge.

*The Actions of the MORANIA 440*

29. At 1645 the barge captain, Captain Temple, was in his cabin on the MORANIA 440 when he heard a loud noise and the MORANIA 440 listed to port. (Temple Tr. 34).

30. Captain Temple promptly looked out the porthole forward and saw a buoy on the starboard side about 300 feet ahead (Temple Tr. 22–23) at a 30 degree angle from the bow (Temple Tr. 23), and shortly thereafter, he observed the barge's starboard side pass abeam the buoy at a distance of 35 to 40 feet (Temple Tr. 25). Captain Temple also saw the BAKER about a quarter of a mile ahead (Temple Tr. 28), about 5 degrees off the port bow (Temple Tr. 27).

31. At about 1648 hours, the BAKER passed the SISTERS and her tow with speed at a close distance which Temple estimated at approximately 200 feet between the port side of the BAKER and the port side of the MORANIA 440. Temple felt the passing was close. Captain Temple's estimate of the distance between vessels on passing is more accurate than Captain Codd's.

32. Captain Temple saw the BAKER pass the flotilla port-to-port when the tow was passing abeam beacon 36 at a distance of about 50–75 feet. (Temple Tr. 37). The MORANIA was thus to the east of the channel but in water of a depth that, according to the Army Corps of Engineer soundings, would not cause it to ground.

33. Although the tug rolled due to the BAKER's wake, the barge was not subjected to any roll. (Temple Tr. 33).

34. Sometime after the passing but before Albany was reached, Captain Temple advised Captain Codd that the MORANIA 440 had grounded.

35. Prior to that time, Captain Codd, Captain Graham and deckhand Schweers had no knowledge of any grounding.

36. Captain Codd was advised by Captain Temple after arrival at Citgo, Albany that there was a crack in the barge's hull; at that time, Captain Codd entered in the SISTERS' log "1700—Rubbed bottom at beacon 36 while passed M/V MELVIN H. BAKER," the position he then estimated the barge must have gone aground.

*The Actions of the BAKER*

37. At all material times the BAKER was being piloted in accordance with the law of the State of New York by a compulsory pilot, Captain Russell S. Syvertsen.

38. Captain Syvertsen was at all material times a senior full branch pilot with the Hudson River Pilots Association.

39. Captain Syvertsen has been piloting vessels on the Hudson River since 1971.

40. While at Ravena, Captain Syvertsen heard the SISTERS' security call made from Fourmile Point. Captain Syvertsen made a security call while at Ravena announcing that the BAKER was getting underway.

41. At 1640, Captain Syvertsen passing New Baltimore could see the SISTERS and MORANIA 440 in the vicinity of buoy 34.

42. By radio telephone at about 1640, Captain Syvertsen and Captain Codd arranged a one whistle, port-to-port passage in the area of buoy 34A and beacon 36.

43. Captain Syvertsen knew that in the place arranged for passing the channel was narrow.

44. Captain Syvertsen knew that the area between buoy 34 and beacon 36 was a place where boats bound up river had run aground on flood tide. (Pl. Exh. 9).

45. Captain Syvertsen's testimony that the passing was arranged for, and took place at, Stuyvesant Anchorage was intentionally false because he knew that the passing should not have occurred where it did.

46. Upon sighting the MORANIA 440, Captain Syvertsen could tell that the MORANIA 440 was carrying a full cargo of oil or gasoline, and he should have realized that Captain Codd would be apprehensive at time of passage.

47. The BAKER's ship's log and engine room log show that Captain Syvertsen did not slow down for the passing and caused the BAKER to maintain full speed from 1640 to 1713 hours, well after the passing occurred. Since the BAKER was proceeding against the tide, the Baker could have slowed down without losing maneuverability.

48. The northeast current at flood tide caused both the BAKER and the SISTERS to be farther to the east side of the channel than planned.

49. Captain Syvertsen did not hug the west side of the channel but passed down the middle or east side of the channel at buoy 36.

*The Actions of the Coast Guard*

50. Chart 12348 states thereon that the channel "730 yards north of Upper Hudson River Light 32 to Albany Turning Basin," which includes the relevant area where buoy 34A, beacon 36 and buoy 38 are located, has a depth of 24.3 feet of water at mean low water in the right outside quarter.

51. Chart 12348 indicates red nun buoys 34A and 38 are channel buoys for guidance as to the east limit of the 400–foot–wide navigation channel. Beacon 36 is fixed and about 175 feet east of the east limit of the channel as shown on Chart 12348. However, the water to the east of the channel lines on the chart and within 75–100 feet of beacon 36 was sufficiently deep for the MORANIA 440 to pass without grounding.

52. U.S. Coast Guard records referring to the establishment of buoy 34A state that this buoy was established "on the channel line to prevent mariners from straying outside the channel" and to prevent them from encountering an obstruction believed to be the remains of former Bug Island Lighthouse. (Pl. Exh. 12; McAllister Exh. R). It was established after a grounding of a tug and barge in October 1973. *See Bouchard Transp. Co. v. Moran Towing & Transp. Co.*, 428 F.Supp. 153, 156 (S.D.N.Y.), *aff'd*, 573 F.2d 1291, 1293 (2d Cir.1977).

53. Buoy 34A was marked as a channel buoy and was not marked to reflect the danger of the former Bug Island Lighthouse or similar rock outcroppings. Therefore, its positioning must be judged as a channel marker.

54. The Coast Guard's assigned position for buoy 34A is about 82 feet east of the east channel limit. The maximum radius the buoy could swing at low tide on its 60 foot chain (the watch circle) attached to its 4000 pound sinker is about 17.7 yards, but the radius at the time of the accident more likely would have been 12.57 yards. (Smoyer Dep. at 27). Normally, the buoy would be north or south of its assigned position depending on the tidal conditions. At the material time, it was northeast of its assigned position due to the flood tide.

55. The last navigational fix obtained on the location of buoy 34A by the U.S. Coast Guard prior to May 23, 1989 was on July 28, 1988 and, based on that fix, buoy 34A was actually fixed at a point approximately 135–140 feet east of the east limit of the 400–foot–wide channel as charted on Chart 12348. (Smoyer Dep. at 45).

56. On the United States's official Chart 12348 dated September 5, 1985, the chart in use at the time, buoy 34A is shown to be tangential to the east side of the channel, i.e. just east of the channel. There is no notation in the 1989 light list published by the Coast Guard that buoy 34A is at a distance of 135–140 feet or one third the width of the charted channel from its eastern edge, nor does Chart 12348 reflect this amount of distance from the eastern edge of the channel.

57. The Department of the Army, New York District, Corps of Engineers map of a survey conducted on November 22, 1988 indicates that buoy 34A was about 120 feet east of the east limit of the 400–foot–wide channel, so that the buoy was not a good guide to mark the east limit of the 400–foot–wide channel.

58. The Department of the Army, New York District, Corps of Engineers map of the survey conducted on May 5, 9 and 10, 1989 indicates that buoy 34A was about 125 feet east of the east limit of the 400–

foot–wide channel, or only about five feet from the location indicated by the November 22, 1988 survey, and that it did not mark the east limit of the 400–foot–wide channel. The radius of 12.57–17.7 yards on which the buoy swings around its anchor means that it is often even further from the eastern boundary of the channel.

59. The Department of the Army, New York District, Corps of Engineers map of the May 5, 9 and 10, 1989 survey indicates soundings of 17.9 and 17.6 feet in an area about 75 to 100 feet east of the east limit of the 400–foot–wide channel as charted on Chart 12348 and about 475 feet southerly of buoy 34A. If the position of buoy 34A is over 100 feet east of the east channel limit, these soundings are in the waters well inside and westerly of a line from the actual positions of buoy 38 to buoy 34A extended in a southerly direction.

60. The only sounding indicated on Chart 12348 that is close to the location of the 17.9 feet and 17.6 feet soundings on the Corps of Engineers map is a 16 foot sounding shown just east of the east limit of the 400 foot channel outside the channel, about 600 feet southerly of buoy 34A and on a line from the charted positions of buoys 38 and 34A extended in a southerly direction.

61. The MORANIA 440 grounded in the area 475 feet south of buoy 34A in the vicinity of the former Bug Island Lighthouse and not in the area of beacon 36.

62. The MORANIA 440 struck the shoals where soundings of 17.6 feet to 17.9 feet are indicated on the Corps of Engineers map when, in anticipation of a passage of the BAKER port-to-port, the SISTERS navigated to her extreme starboard just inside, or westerly of, an extension of a line from the actual positions of buoys 38 and 34A extended in a southerly direction. This position is consistent with the estimated position where Captain Temple heard and felt the grounding and Captain Codd's testimony about his position in relation to buoy 34A and 38 as he proceeded north towards buoy 34A.

63. The first navigational fix obtained on the location of buoy 34A by the U.S. Coast Guard subsequent to May 23, 1989 was on May 31, 1989 and, based on that fix, buoy 34A was approximately 110–115 feet east of the east limit of the 400–foot–wide channel, establishing that buoy 34A's position east of the east channel limit had remained substantially the same since July 28, 1988 to May 31, 1989.

64. The U.S. Coast Guard's annual records checking the location of buoy 34A confirm the stability of buoy 34A in that since 1984 (which was as far back as the Coast Guard checked its records); buoy 34A has always remained on station within the parameters set by the Coast Guard.

65. Captain Codd was deceived by the position of buoy 34A, which was also carried to the northeast by the full tide and, although marked only slightly off channel on the charts, was in fact anchored 110–135 feet off channel.

## CONCLUSIONS OF LAW

### Liability of the SISTERS

66. At around 1620, Captain Codd was aware that a passing of the BAKER could occur around 1700 hours; instead of proceeding upriver, he could and should have caused passage to occur at Stuyvesant Anchorage, a safer place for passage than the narrow channel where the passing took place. See Bouchard, 428 F.Supp. at 154–55.

67. The SISTERS was negligent in moving east of the charted channel lines in anticipation of the passing of the BAKER. In departing from the channel, Captain Codd failed to note that his position was in the area where the depth of water was charted at 16 feet. Since the SISTERS was not equipped with a Fathometer, equipment supplied to other such tugs, Captain Codd did not have the means to check his position against a reading of the depth of the channel. This lack of equipment was a contributing cause of the grounding.

68. Captain Codd was navigating with a highly inflammable cargo and preparing in a narrow channel in the vicinity of buoy 34A and beacon 36 for immediate passing by a much larger vessel, by then near Matthew Point; Captain Codd thus con-

fined his observations to matters ahead and did not utilize, as he should have, beacon 32 and buoy 34 positioned to the rear for pilotage bearings.

69. Although Captain Codd having been on duty for a total of over 12 hours, since 0000 hours on May 22–23, 1989, may have been in violation of 46 U.S.C. § 8104(h) and 46 C.F.R. § 15.705(d), such violation did not contribute to the accident.

70. The SISTERS' failure to sound five short blasts to express doubt as to the actions of the BAKER, possibly in violation of 33 U.S.C. § 2034(d), did not contribute to the accident.

71. The SISTERS' failure to post a lookout, possibly in violation of 33 U.S.C. § 2005, did not contribute to the accident.

72. Actions of the SISTERS were a 65 percent contributing cause of the grounding of the MORANIA 440.

*Liability of the BAKER*

73. Because the channel narrows in the vicinity of buoy 35 due to a bend in the river, the reach between buoys 34A and 38 is generally considered a poor place for passing; Stuyvesant Anchorage has been recognized as a better area for passing than the area north of buoy 35. *See Bouchard*, 428 F.Supp. at 154–55.

74. Captain Syvertsen was aware that the SISTERS was at Fourmile Point and proceeding upriver while the BAKER was still in port and knew that the SISTERS would pass the BAKER. Still, the BAKER failed to arrange a passage, as it should have, in the Stuyvesant Anchorage, a part of the channel that the BAKER knew to be safer than the area between buoy 34A and beacon 36.

75. The BAKER was negligent in failing to reduce its speed well prior to the passing of the vessels, in failing to give a wider berth preparatory to passing the SISTERS, and in not keeping to the outer western limit of the channel, in violation of 33 U.S.C. §§ 2006, 2008, 2009.

76. Although the damage to the MORANIA 440 occurred more than two minutes before the passage of the BAKER and the SISTERS, the evidence does not establish that the statutory violations by the BAKER could not have contributed to Captain Codd's decision to move even farther to his starboard, which resulted in movement by the SISTERS out of the channel and the grounding of the MORANIA 440. *See The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874), *overruled on other grounds, United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); *Tug Ocean Prince v. United States*, 584 F.2d 1151, 1160 (2d Cir.1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979).

77. No in personam liability exists against Seaways Shipping Corp. as owner of the BAKER or Skaarup Shipping Corp. as the operator of the BAKER, since the BAKER was being piloted by a compulsory pilot pursuant to the law of the State of New York and since any injury caused by the BAKER was exclusively the result of the compulsory pilot's negligence. *See* N.Y.Nav.Law § 89–a(1) (McKinney 1989); *Homer Ramsdell Transp. Co. v. La Compagnie Generale Transatlantique*, 182 U.S. 406, 416–17, 21 S.Ct. 831, 835–36, 45 L.Ed. 1155 (1901); *The Abangarez*, 60 F.2d 543, 544 (E.D.La.1932); Gilmore & Black, The Law of Admiralty 520–21 (2d ed. 1975).

78. Actions of the BAKER were a 20 percent contributing cause of the grounding of the MORANIA 440.

*Liability of the Coast Guard*

79. The accident was not caused in any way by lack of maintenance of the channel by the Army Corps of Engineers.

80. The Coast Guard has discretion in determining whether it will undertake the duty of establishing, maintaining and operating aids to maritime navigation to serve the needs of the commerce of the United States. *See* 14 U.S.C. § 81(1); *Indian Towing Co. v. United States*, 350 U.S. 61, 69, 76 S.Ct. 122, 126–27, 100 L.Ed. 48 (1955).

81. Once the Coast Guard determined that it would place buoy 34A, thereby engendering reliance on the guidance afforded by the buoy, it had the duty to carry out and maintain the placing of the

buoy without negligence. *Id.; Afran Transp. Co. v. United States,* 435 F.2d 213, 215–16 (2d Cir.1970), *cert. denied,* 404 U.S. 872, 92 S.Ct. 72, 30 L.Ed.2d 116 (1971).

82. The United States Coast Guard's positioning of buoy 34A was misleading for northbound vessels engaged in passage of vessels in the area. South of buoy 34A, a pilot such as Captain Codd, relying on the relative positions of buoy 38 and buoy 34A as channel markers, would be deceived as to buoy 34A's position relative to the east side of the channel based on its position on Chart 12348 and the failure of the Coast Guard's light list to note that the buoy's anchor is 110 to 135 feet off the channel's edge.

83. Although mariners are warned not to rely "on buoys alone for determining their positions," 33 C.F.R. § 62.23(c)(3); Govt. Exh. EEE at iii-iv; McAllister Exh. FF, Captain Codd was entitled to place some reliance upon the representations made in Chart 12348 relative to the location of buoy 34A. *See Afran Transp.,* 435 F.2d at 215.

84. The evidence does not establish that negligence or failure of the Coast Guard to maintain the charted position of buoy 34A or to indicate the buoy's location more accurately on Chart 12348 was the proximate cause of the grounding. *See Bouchard,* 428 F.Supp. at 154–55. But the Coast Guard's failure to indicate the buoy's location more accurately on the chart or by the light list was a contributing cause of the accident. *Cf. id.* at 156.

85. Actions of the Coast Guard were a 15 percent contributing cause of the grounding of the MORANIA 440.

Counsel for the parties are to attend a conference on Wednesday, December 4, 1991 at 9:00 a.m. in Courtroom 302 to schedule trial or settlement of the damages aspect of the case.

IT IS SO ORDERED.